**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE 1**, *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:26-cv-494** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **JOSEPH B. EDLOW**, *et al.*, | : | **Magistrate Judge Chelsey M. Vascura** |
| | : | |
| **Defendants.** | : | |
| | : | |

<u>**OPINION & ORDER**</u>

This matter comes before this Court on Plaintiffs' Motion for a Preliminary Injunction (ECF No. 9).  For the following reasons, Plaintiffs' Motion is **GRANTED**.

### I.    INTRODUCTION

This case concerns the legality of a series of policies developed and implemented by U.S. Citizenship and Immigration Services (USCIS) and the Department of Homeland Security (DHS). These policies indefinitely pause USCIS's final adjudication of pending immigration benefit applications submitted by foreign nationals from certain countries, and treat nationality from those countries as a significant and negative factor in that adjudication process.

Plaintiffs are twenty-five foreign nationals who hold citizenship in a variety of countries: Burma, Canada, Iran, Nigeria, Syria, Tanzania, and Venezuela.  In accordance with our nation's laws and immigration scheme, they have all submitted applications for immigration benefits that are presently pending before USCIS.   Their applications include applications for work authorization and green cards.  These foreign nationals are not outside the country; they reside across the United States.  Many of them have been in the United States for years, and already have received prior authorization to work here.  Plaintiffs include a hospital pharmacist, a registered

1

nurse and cancer researcher receiving federal funding, college graduates with pending job offers in the fields of science and engineering, a university professor, and young couples raising families.

USCIS issued the challenged policies following two proclamations issued by President Donald J. Trump that govern the entry of foreign nationals into the United States. These proclamations do not address USCIS's task of adjudicating immigration benefit applications. Nor do they concern foreign nationals already present in the United States. Nevertheless, USCIS has, by policy, uniformly held the final adjudications of immigration benefit applications for foreign nationals from certain countries—including foreign nationals from Burma, Iran, Nigeria, Syria, Tanzania, and Venezuela. USCIS will also treat Burmese, Iranian, Nigerian, Syrian, Tanzanian, and Venezuelan nationality as a significant negative factor when considering such applications from those countries.

Plaintiffs sue to contest these policies, proceeding anonymously because they challenge Government policy. They allege that these policies were promulgated improperly, and thus violate the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, as well as the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* Defendants are high-ranking Government officers. Defendant Joseph B. Edlow is the Director of USCIS, and Defendant Markwayne Mullin is the Secretary of DHS. Now, Plaintiffs seek emergency relief to block the continued implementation of these policies to their applications, arguing that they are likely to succeed on the merits and would suffer irreparable harm if the Defendants are not enjoined.

At a high level, this case follows an increasingly familiar procedural posture. Plaintiffs seek a preliminary injunction to challenge an agency's implementation of executive action under circumstances where the President likely would "have had difficulty passing significant new legislation through Congress." *Trump v. CASA, Inc.*, 606 U.S. 831, 878 (2025) (Kavanaugh, J.,

concurring). Many similar challenges have been levied by other plaintiffs against these same policies across the country, and courts have consistently granted preliminary relief against USCIS and the Government. *E.g.*, *Varniab v. Edlow*, 2026 WL 485490, at *24–25 (N.D. Cal. Feb. 20, 2026); *Bowser v. Noem*, 2026 WL 555624, at *10 (D. Mass. Feb. 27, 2026); *Behdin v. Edlow*, 2026 WL 1031079, at *26–27 (N.D. Cal. Apr. 16, 2026); *Karimi v. Mullin*, 2026 WL 1103448, at *11 (W.D. Ark. Apr. 23, 2026); *Saghafi v. Edlow*, 2026 WL 1127468, at *15–16 (D. Md. Apr. 24, 2026); *Meschi v. Edlow*, 2026 WL 1157151, at *2 (N.D. Cal. Apr. 29, 2026); *Doe v. Trump*, 2026 WL 1170971, at *20–21 (D. Mass. Apr. 30, 2026); *Rohagee v. Mullin*, 2026 WL 1243356, at *2 (C.D. Cal. May 4, 2026); *Pouri v. Dep't of Homeland Sec.*, 2026 WL 1508425, at *11 (D.D.C. May 30, 2026); *Sepehri v. Mullin*, 2026 WL 1678050, at *6 (N.D. Ind. June 9, 2026). Additionally, Judge John J. McConnell recently determined that these USCIS policies were unlawful at the summary judgment stage. *Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.*, _ F. Supp. 3d __, 2026 WL 1622708, at *57 (D.R.I. June 5, 2026).

## II.  BACKGROUND

### A.  Executive Branch Rhetoric

In 2024, the American electorate chose Donald Trump to serve a second, nonconsecutive term as president with then-Senator J.D. Vance as his vice president. As candidates, both Trump and Vance promised to take a hard line on immigration and the border to secure the nation, prevent undesirable immigration, and protect American jobs. For instance, at a September 18, 2024 campaign rally in Uniondale, New York, then-candidate Trump stated:

> [A] key part of restoring safety and saving our economy is stopping the invasion at the border of our country. . . . We have massive numbers of terrorists coming in to our country. You have everybody coming in—we have people who can't speak the language. . . .

3

I want to be known as your border president—I'm going to be known as your border president. And Kamala will be known as your invasion president—just let them all come in, let them all come in. No. We've got to save our country. Our country's going down. If you look at what is happening with the Venezuelans taking over, I mean they're taking over large pieces of real estate in Colorado. And you have a Democrat governor who is petrified of them. He's afraid, I've never seen anything like it, and he doesn't want to talk about it. They've taken over your buildings and your land—you've got to do something about it. . . .

I've been talking about migrant crime for 5 years, I said, if you let them in, it's going to be hell, they are vicious, violent criminals that are being let into our country. They are people that their countries, which are very smart, do not want them. That's why all over the world, a lot of people are coming out of jails out of the Congo, in Africa. Where do you come from? The Congo. Where in the Congo? We come from jail. What did you do? We will not tell you. They're coming from the Congo. They're coming from Africa, they're coming from the Middle East, they're coming from all over the world. Asia, a lot of it coming from Asia. And what's happening to our country is we're just destroying the fabric of life in our country, and we're not going to take it any longer, and you gotta get rid of these people.[1]

A few days later, at a campaign rally in Wilmington, North Carolina, Trump pledged:

I will get every migrant criminal out of our country and I'll get them out fast, we have to, we have no choice. And they're taking over our country, you see what they are doing, Kamala Harris's border invasion is also crushing the jobs and wages of African-American workers and Hispanic American workers and also union members, unions are next, you watch. They are working and hurting what's going on with African-American workers and with Hispanic in particular, just, they're taking your jobs, they're taking your jobs. Every job produced in this country over the last two years has gone to illegal aliens. Every job. Think of it. We are—what we're doing to this country is so sad, you know. . . . Last month American-born workers lost, think of this, 1.3 million jobs. So, American voters, and they're voters, American workers lost 1.3 million jobs. Meanwhile, the migrants picked up 635,000 jobs, plus another 700 or 800,000 jobs that we know of, but the Americans lost jobs. What a disgrace. . . . To save your jobs you must vote for Trump.[2]

---

[1] LiveNOW from Fox, *FULL SPEECH: Trump Holds Rally on Long Island*, 38:06–41:49, 51:58–52:47 (YouTube, Sept. 18, 2024), available at https://www.youtube.com/watch?v=A0F-NwN1wq4 (last visited June 25, 2026).

[2] Fox 4 Dallas-Fort Worth, *Trump Rally in North Carolina: Full Speech*, 21:39–24:29 (YouTube, Sept. 21, 2024), available at https://www.youtube.com/watch?v=GJMq2Y4RhM4 (last visited June 25, 2026).

Trump's running mate Vance also amplified this anti-immigration rhetoric.  For example, he drew national scrutiny through a now-infamous social media post, where he suggested that "Haitian illegal immigrants" had been "generally causing chaos all over Springfield, Ohio" and that "[r]eports now show that people have had their pets abducted and eaten by people who shouldn't be in this country."[3]  Although Vance hedged his statements a day later by acknowledging the possibility "that all these rumors will turn out to be false,"[4] Trump subsequently repeated the same claims during a presidential debate with then-Vice President Kamala Harris.[5]  Defending his statements a week later, Vance explained his position that "[t]he American media totally ignored this stuff until Donald Trump and I started talking about cat memes.  If I have to create stories so that the American media actually pays attention to the suffering of the American people, then that's what I'm gonna do."[6]  Ohio Governor Mike DeWine critiqued Vance and Trump, explaining that they "lack[ed] evidence," "disparage[d] the legal migrants living in Springfield," including Haitians, and led to safety concerns and the deployment of Ohio State Highway Patrol troopers to Springfield following bomb threats at schools, a hospital, and city hall.[7]

---

[3] J.D. Vance (@JDVance), X (Sept. 9, 2024, at 2:22 P.M. ET), available at https://x.com/JDVance/status/1833148904864465117 (last visited June 25, 2026).

[4] J.D. Vance (@JDVance), X (Sept. 10, 2024, at 1:58 P.M. ET), available at https://x.com/JDVance/status/1833505359513661762 (last visited June 22, 2026).

[5] *See* Daniel Arkin and David Ingram, *Trump Pushes Baseless Claim About Immigrants 'Eating the Pets'*, NBC (Sept. 10, 2024), available at https://www.nbcnews.com/politics/2024-election/trump-pushes-baseless-claim-immigrants-eating-pets-rcna170537 (last visited June 25, 2026).

[6] CNN, *Watch Dana Bash's Full Interview with Sen. JD Vance*, at 11:09–11:25 (CNN, Sept. 15, 2024), available at https://www.cnn.com/2024/09/15/politics/video/sotu-bash-vance-haitian-immigrants-full-interview (last visited June 17, 2026).

[7] Mike DeWine, *I'm the Republican Governor of Ohio.  Here is the Truth About Springfield*, N.Y. Times (Sept. 20, 2024), available at https://www.nytimes.com/2024/09/20/opinion/springfield-haitian-migrants-ohio.html (last visited June 22, 2026).

Weeks before election day, Trump emphasized that immigration would be a defining focus of his administration.  At a campaign rally in Prescott Valley, Arizona on October 13, 2024, he promised that "when I win on November 5th, the migrant invasion ends and the restoration of our country begins," cautioning that if Vice President Harris were to win, "the entire country will be turned into a migrant camp, and that's what's happening."[8]

President Trump won the 2024 presidential election and was inaugurated on January 20, 2025.  True to his campaign promises, his second administration immediately focused on immigration, seeking to strengthen border security and minimize migration from certain countries.  As President Trump promised during a stop in Mount Pocono, Pennsylvania on December 9, 2025, his administration would, through a series of policies, create "a permanent pause on third world migration, including from hellholes like Afghanistan, Haiti, Somalia, and many other countries."[9]  After a member of the crowd apparently exclaimed "Shitholes!" in response, President Trump laughed and retorted that "I didn't say shithole, you did," before recounting a 2018 oval office meeting he had during his first term:

> Remember I said that to the Senators, they came in, the Democrats.  They wanted to be bipartisan, so they came in and they said this is totally off the record.  Nothing mentioned here.  We want to be honest because our country was going to hell.  And we had a meeting and I said, *why is it we only take people from shithole countries*, right?  Why can't we have some people from Norway, Sweden, just a few, let's have a few.  From Denmark—do you mind sending us a few, send us some nice people, do you mind?  But we always take people from Somalia; places that are a disaster, right?  Filthy, dirty, disgusting, ridden with crime.  The only thing they're

---

[8] WAAY 31 News, *Full Remarks:  Donald Trump Speaks at Rally in Prescott Valley, Arizona*, at 3:47–4:06 (YouTube, Oct. 13, 2024), available at https://www.youtube.com/watch?v=XqiGp6X-exs (last visited June 22, 2026).

[9] WNEP, *FULL SPEECH:  President Trump Speaks in the Poconos*, at 1:24:50–1:25:02 (YouTube, Dec. 9, 2025), available at https://www.youtube.com/watch?v=JKXW5MnjKz4&t=1s (last visited June 22, 2026); *see* White House, *President Trump in Pennsylvania:  America Is Back—And We're Just Getting Started* (Dec. 10, 2025), available at https://www.whitehouse.gov/releases/2025/12/president-trump-in-pa-america-is-back-and-just-getting-started/ (last visited June 24, 2026) (citing, *inter alia*, a WNEP article covering the event).

good at is going after ships.  But they don't go after our ships, you know why?  Because that same missile that knocks the crap out of them, that with the drug dealers from Venezuela and others.[10]

In sum, both the President and the Vice President have publicly and repeatedly expressed outright hostility toward immigrants, both before and after the 2024 presidential election. Their ire appears focused on immigrants from countries in the Caribbean, South America, Africa, and Asia.  As the Supreme Court just observed, President Trump's comments have "broadly denigrate[d] countries" and "malign[ed]" certain groups of immigrants.  *Mullin v. Doe*, 609 U.S. __, 2026 WL 1825840, at *11 (June 25, 2026).  These include the extraordinary statements that certain foreign nationals, including Haitians, are "poisoning the blood" of the United States.  *Id.* at *20 (Kagan, J., dissenting).

This general hostility to immigration contrasts with an apparent interest in and preference for the migration of white people.  Aside from a stated desire for more Scandinavian immigration, President Trump has sought to welcome white South Africans. On February 7, 2025, he signed Executive Order 14161, titled *Addressing Egregious Actions of the Republic of South Africa*.  90 Fed. Reg. 9497 (Feb. 7, 2025).  In that Executive Order, the president determined that "the United States shall promote the resettlement of Afrikaner refugees escaping [the government of South Africa's] race-based discrimination, including racially discriminatory property confiscation.  *Id.* at 9497.  In accordance with President Trump's Executive Order, the overwhelming number of refugees to the United States appear to be white Afrikaners from South Africa,[11] and the

---

[10] *Id.* at 1:25:03–1:2621 (emphasis added); Amy B. Wang, *Trump Finally Confirms Using Vulgar Slur About Several Countries in 2018*, Wash. Post (Dec. 10, 2025), available at https://www.washingtonpost.com/politics/2025/12/10/trump-shithole-countries-comment-admission/ (last visited June 22, 2026).

[11] Afrikaners "are White South Africans descended principally from families that moved to South Africa before the British acquired permanent control of the cape colony from the Dutch East India

White House has touted the plight of "white farmers in South Africa."[12] Thus, from October 1, 2025 through May 31, 2026, 6,665 of the 6,668 refugees admitted into the United States were from South Africa.[13]

This Court takes judicial notice of these statements and facts, as they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Some statements and facts can be judicially noticed as statements contained in or incorporated by reference in official Government websites. *See Yoder v. Bowen*, 146 F.4th 516, 526 n.1 (6th Cir. 2025) (per curiam). Other statements and facts "are outside of reasonable controversy," and thus the process of introducing them into evidence can be "dispensed with as unnecessary" since they have a "high degree of indisputability." Fed. R. Evid. 201(a) advisory committee's note; *cf. Mullin*, 2026 WL 1825840, at *11; *id.* at *20 (Kagan, J., dissenting); *see, e.g.*, *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 522 n.6 (N.D. Cal. 2017) (taking judicial notice of President Trump's February 5, 2017 interview with Bill O'Reilly); *Texas v. United States*, 2015 WL 1540022, at *4 (S.D. Tex. Apr. 7, 2015) (taking judicial notice of President Obama's statements made during a town hall because "[t]he President's statements have obvious significance to this case"), *aff'd*, 809 F.3d 134, 185 (5th Cir. 2015) (affirming district court's entry of preliminary injunction while observing "the impact of the President's statement"); *United*

---

Company in the early 19th century." Christopher A. Ford, *Challenges and Dilemmas of Racial and Ethic Identity in American and Post-Apartheid South African Affirmative Action*, 43 UCLA L. Rev. 1953, 1970 n.70 (1996).

[12] White House, *President Trump is Right About What's Happening in South Africa*, (May 21, 2025), available at https://www.whitehouse.gov/releases/2025/05/president-trump-is-right-about-whats-happening-in-south-africa/ (last visited July 1, 2026).

[13] U.S. Dep't of State, *Refugee Arrivals by State and Nationality*, (May 31, 2026), available at https://www.rpc.state.gov/admissions-and-arrivals/ (last visited July 1, 2026) (the remaining 3 refugees were from Afghanistan).

*States v. Abrego Garcia*, 2026 WL 1454303, at *1–2 (M.D. Tenn. May 22, 2026); *id.* at *2 ns. 3, 4, & 6 (taking judicial notice of DHS press release, *Tennessee Star* article, and *Fox News* article); *In re Grand Jury Subpoenas*, 2026 WL 1783899, at *6–7 (D. Minn. June 22, 2026) (finding "the public record . . . replete with direct evidence of the Trump administration['s]" efforts regarding immigration enforcement); *see also Trump v. Hawaii*, 585 U.S. 667, 701–02 (2018) (weighing, at the preliminary injunction stage, the import of President Trump's "extrinsic" statements regarding the entry of Muslim foreign nationals into the United States, and deemphasizing "the significance of those statements in reviewing a Presidential directive, neutral on its face").

These facts and statements are important but not essential to this Court's ultimate holding on this preliminary record. They inform this Court's analysis of one factor of one of Plaintiffs' claims, *see* Section IV(B)(1), *infra*, but this Court also finds that Plaintiffs are likely to succeed on the merits of other claims. Still, these statements and facts are important because they provide significant background and frame the issues at stake.[14]

### B. Factual Background

#### 1. Executive Action

Eager to deliver on a central campaign promise, President Trump's administration immediately took action to address immigration through executive action, beginning with an executive order and continuing via two presidential proclamations.

---

[14] *Cf. In re Silver Lake Grp., LLC Secs. Litig.*, 108 F.4th 1178, 1185 n.3 (9th Cir. 2024) (courts may take judicial notice of the existence of news articles and reports "to establish public knowledge"); *Lim v. Hightower*, 2025 WL 2965692, at *4 (6th Cir. Oct. 21, 2025) (similar).

#### a. *Executive Order 14161*

On the same day he was inaugurated, Trump issued Executive Order 14161, titled *Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats*. 90 Fed. Reg. 8451, 8451 (Jan. 30, 2025). This Executive Order directed the Secretary of State, Attorney General, Secretary of Homeland Security, and Director of National Intelligence to: (1) identify resources for vetting and screening foreign nationals who were "seeking admission to the United States or who are already in the United States"; (2) "determine the information needed from any country to adjudicate any visa, admission, or other benefit" under the Immigration and Nationality Act for one of that country's nationals "to ascertain whether the individual seeking the benefit is who the individual claims to be" and "is not a security or public-safety threat"; (3) restore screening and vetting standards (as they existed at the end of President Trump's first term on January 19, 2021) for foreign nationals seeking "a visa or immigration benefit of any kind"; and (4) "vet and screen to the maximum degree possible" foreign nationals seeking admission to or already present in the United States, "particularly" those "from regions or nations with identified security risks." *Id.* The order also directed those officers to identify countries "for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries" under 8 U.S.C. § 1182(f). *Id.*

#### b. *Presidential Proclamation 10949*

A few months later, on June 4, 2025, President Trump issued Presidential Proclamation 10949, titled *Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*. Proclamation No. 10949, 90 Fed. Reg. 24497 (June 10, 2025). Proclamation 10949 characterized certain countries as having inadequate screening, vetting, identity-management, information-sharing, visa-overstay,

terrorism-related, or repatriation practices, and placed entry restrictions on foreign nationals from those countries. *Id.* at 24498–24499.

Proclamation 10949 fully suspended the entry of foreign nationals from twelve countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen into the United States. *Id.* at 24499–24501. It also imposed partial restrictions on seven other countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. *Id.* at 24501–24502.

By its terms, Proclamation 10949 only imposed entry restrictions, governing foreign nationals who were "outside the United States on the applicable effective date" and who lacked a "valid visa" on that date. *Id.* at 24502–24503. It came into effect on June 9, 2025. *Id.* at 24504.

### c. Presidential Proclamation 10998

On December 16, 2025, President Trump issued Presidential Proclamation 10998, expanding the scope of Proclamation 10949. Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 19, 2025). Titled *Restricting and Limiting the Entry of Foreign Nationals To Protect the Security of the United States*, Proclamation 10998 expanded the foreign nationals subject to the administration's entry restrictions, naming "additional countries that cannot meet basic criteria for identifying their nationals and residents who pose national security and public safety threats and for sharing information with the United States." *Id.* at 59718.

Proclamation 10998 maintained the full entry restrictions on foreign nationals from the countries subject to full entry restrictions by Proclamation 10949, and added seven additional countries: Burkina Faso, Laos, Mali, Niger, Sierra Leone, South Sudan, and Syria to that list. *Id.* at 59721. It continued partial restrictions on foreign nationals from four countries: Burundi, Cuba, Togo, and Venezuela; and it modified partial restrictions on one country: Turkmenistan. It also

11

subjected foreign nationals from fifteen additional countries to partial restrictions: Angola, Antigua and Barbuda, Benin, Cote d'Ivoire, Dominica, Gabon, The Gambia, Malawi, Mauritania, Nigeria, Senegal, Tanzania, Tonga, Zambia, and Zimbabwe. *Id.* at 59721–59722.

This proclamation's scope was limited "to foreign nationals of the designated countries" who were "outside the United States on the applicable effective date of this proclamation" and "do not have a valid visa on the applicable effective date of this proclamation." *Id.* at 59726. Proclamation 10998 came into effect on January 1, 2026. *Id.* at 59728.

### 2. Policy Implementation

Against this backdrop, DHS and USCIS implemented adjudicatory holds across pending immigration benefit applications filed by foreign nationals who were from countries referenced in President Trump's proclamations but present inside the United States. They also indicated that they would treat the nationality of applicants from these referenced countries as a negative factor when adjudicating those applications.

DHS and USCIS implemented these policies even though the presidential proclamations did not address pending immigration benefit applications submitted by foreign nationals inside the United States.

### a. Policy Alert PA-2025-26

First, on November 27, 2025, DHS and USCIS incorporated the country-specific concerns identified by President Trump's first presidential proclamation, Proclamation 10949, to the adjudication of immigration benefit applications. They did so by updating the USCIS Policy Manual and issuing Policy Alert PA-2025-26, titled *Impact of INA 212(f) on USCIS' Adjudication of Discretionary Benefits*. (ECF No. 1-1). Policy Alert PA-2025-26 stated that "[e]ffective immediately, USCIS will consider relevant country-specific facts and circumstances such as those

12

outlined in [Proclamation] 10949 as part of its adjudication of discretionary benefit requests," including "certain adjustment of status applications, extension of nonimmigrant stay, and change of nonimmigrant status." (*Id.* at 1). USCIS would treat those "country-specific factors" as "significant negative factors" when adjudicating discretionary benefit requests. (*Id.* at 2).

### b. Policy Memo. PM-602-0192

Then, on December 2, 2025, DHS and USCIS issued Policy Memorandum PM-602-0192. Policy Memorandum PM-602-0192 was also based on Proclamation 10949, and was titled *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries*. (ECF No 1-2). It directed USCIS personnel to: (1) hold Form I-589 applications (Applications for Asylum and for Withholding of Removal) "regardless of the alien's country of nationality, pending a comprehensive review"; (2) hold other pending benefit request applications[15] submitted by foreign nationals from countries listed in Proclamation 10949 "pending a comprehensive review, regardless of entry date"; and (3) "[c]onduct a comprehensive re-review of approved benefit requests for aliens from countries listed in [Proclamation] 10949 who entered the United States on or after January 20, 2021."[16] (*Id.* at 1).

Thus, Policy Memorandum PM-602-0192 initiated an adjudicatory hold on many types of immigrant benefit applications submitted by foreign nationals from the countries identified in Proclamation 10949. Although Proclamation 10949 had, by its terms, only addressed the *entry* of

---

[15] The Memorandum lists this directive as "[i]ncluding" applications under "Form I-485 (Application to Register Permanent Residence or Adjust Status), Form I-90 (Application to Replace Permanent Residence Card (Green Card)), Form N-470 (Application to Preserve Residence for Naturalization Purposes), Form I-751 (Petition to Remove Conditions on Residence), and Form I-131 (Application for Travel Documents, Parole Documents, and Arrival/Departure Records)." (ECF No. 1-2 at 1 n.4).

[16] January 20, 2021 was the date when President Trump's first term in office ended, and President Joseph R. Biden, Jr. was inaugurated. *Blassingame v. Trump*, 87 F.4th 1, 6, 10 (D.C. Cir. 2023).

foreign nationals from certain countries—including the full suspension of entry for foreign nationals from Burma and Iran, and the partial restriction on entry for foreign nationals from Venezuela—USCIS would effectively expand upon Proclamation 10949's entry restrictions and apply a hold to immigrant benefit applications submitted by foreign nationals already lawfully within the United States.

c.   *Policy Memo. PM-602-0194*

Finally, DHS and USCIS issued Policy Memorandum PM-602-0194, entitled *Hold and Review of USCIS Benefit Applications Filed by Aliens from Additional High-Risk Countries* on January 1, 2026.  (ECF No. 1-3).  This was the same day that Proclamation 10998—which expanded entry restrictions to additional countries—came into effect.  Policy Memorandum PM-602-0194 directed USCIS personnel to "hold . . . all pending benefit applications, for aliens listed in [Proclamation] 10998 . . . pending a comprehensive review, regardless of entry date."  (*Id.* at 1).  Such a hold would permit "a case to proceed through processing, up to final adjudication." (*Id.* at 1 n.2).  It also mandated comprehensive reviews of "all policies, procedures, and screening and vetting processes for benefit requests" submitted by foreign nationals from the countries listed in Proclamation 10998, as well as "comprehensive re-review[s] of approved benefit requests implicated in [Proclamation] 10998 that were approved on or after January 20, 2021." (*Id.* at 1).

Thus, Policy Memorandum PM-602-0194 expanded the immigration benefit application hold to the expanded list of countries identified in Proclamation 10998.  Again, even though President Trump's Proclamation 10998 only addressed the *entry* of foreign nationals from an expanded list of countries—by its terms, foreign nationals from Burma, Iran, and Syria would be subject to a full suspension of entry, while foreign nationals from Venezuela, Nigeria, Tanzania, and Zimbabwe would be subject to partial restrictions—USCIS transposed the president's entry

14

restrictions to apply to adjudications of immigrant benefit applications submitted by foreign nationals already within the United States.

### C. Procedural History

Plaintiffs sued on April 23, 2026, challenging these USCIS policies and the resulting adjudicatory holds on their pending immigration benefit applications. (Compl., ECF No. 1 ¶¶ 1–7).[17] Plaintiffs are differently-situated in many ways. They are citizens of Burma, Canada, Iran, Nigeria, Syria, Tanzania, and Venezuela, and reside in thirteen different states across the country: from California to Massachusetts and Florida, and ten states in between. (¶¶ 14–33). Many Plaintiffs are graduates of American universities with jobs or job offers in the fields of science or engineering. One is a physics professor. Others work in healthcare, including at a hospital and in cancer research. Some are young parents raising their families in the United States. (¶ 2). But Plaintiffs also share key commonalities. They all claim to be present legally in the United States with pending immigration benefit applications. (*See* ¶¶ 6, 57). And they all challenge the same USCIS policies. (¶¶ 7, 57).

Most of the Plaintiffs have Form I-485 applications (for lawful permanent residence status) or Form I-765 applications (for employment authorization) pending. (¶¶ 14–29, 31–33). Several paid extra for expedited processing of their applications. (ECF Nos. 9-6 ¶ 5; 9-10 ¶ 7; 9-11 ¶ 3; 9-16 ¶ 5). Two Plaintiffs—Jane Doe 9 and Jane Doe 18—also have Form I-129 (petition for nonimmigrant employment under an H-1B visa) or Form I-131 (application for travel documents) applications pending alongside their pending Form I-485/Form I-765 applications. (¶¶ 22, 31). Jane Doe 9's circumstances are notable because she already received USCIS approval of her Form

---

[17] All references to "Compl." and paragraph citations "(¶¶ __)" cite to Plaintiffs' Complaint (ECF No. 1), unless otherwise stated.

I-765, but has not received her actual employment authorization document due to the adjudicatory hold. (¶ 9). A different Plaintiff, John Doe 17, only has one application pending: a Form I-129 for an H-1B visa. (¶ 30). Finally, one other Plaintiff—Jane Doe 13—was born in Zimbabwe but is a Canadian citizen. (ECF No. 9-13 ¶¶ 2, 6). Canada is not identified as a country of concern in any of President Trump's proclamations, and it is unclear why she is being subjected to challenged policies at all.

On May 1, 2026, Plaintiffs moved for a preliminary injunction, seeking to enjoin USCIS from enforcing Policy Alert PA-2025-26, Policy Memorandum PM-602-0192, and Policy Memorandum PM-602-0194, arguing that the sweeping adjudicatory hold placed on their applications, as well as the mandate to treat their nationality as a significant negative factor in evaluating their applications, violate the Administrative Procedure Act and the Immigration and Nationality Act, and contend that they will suffer irreparable harm absent emergency relief. (ECF No. 9-1). In response, Defendants moved to sever and transfer venue for twenty-four of the Plaintiffs, arguing that most of the Plaintiffs' claims should not be brought in the U.S. District Court for the Southern District of Ohio, and pointing out the variations in Plaintiffs' respective statuses. (ECF No. 11). On May 26, 2026, this Court held a telephonic status conference to address these motions and schedule a preliminary injunction hearing. This Court subsequently denied the Defendants' motion to sever and transfer venue, finding that Plaintiffs were properly joined, severance would be inappropriate, and venue was proper in this district given that John Doe 1 resides in Columbus, Ohio. *Doe 1 v. Edlow*, 2026 WL 1551970, at *3, *11 (S.D. Ohio June 2, 2026) (Marbley, J.) (ECF No. 20). Defendants then opposed the preliminary injunction, (ECF No. 21), and Plaintiffs replied in support. (ECF No. 21).

16

This Court held a hearing on the requested preliminary injunction on June 10, 2026.  At that hearing, the Government[18] elected to stand on its briefing, representing that it anticipated this Court would find the challenged policies unlawful and preliminarily enjoin Defendants.  So the Government mainly tailored its argument to the scope of a possible remedy.[19]

### III.    JURISDICTION

Defendants first argue that this Court lacks jurisdiction to hear Plaintiffs' claims under 8 U.S.C. § 1252(a)(2)(B) because Plaintiffs ultimately seek agency determinations regarding discretionary benefits.  (ECF No. 21 at 4–10).  Plaintiffs counter that this Court has jurisdiction because the relevant statutory discretion granted to USCIS governs the "outcome" of an immigration benefit application, "not to whether one must occur."  (ECF No. 22 at 3).  They also assert that the Sixth Circuit's decision in *Barrios Garcia v. Dep't of Homeland Sec.*, 25 F.4th 430 (6th Cir. 2022) controls and holds that judicial review is barred only when Congress "has unambiguously and wholly committed an action to agency discretion, and does not reach USCIS's refusal to adjudicate a pending application at all."  (ECF No. 22 at 3) (citing *Barrios Garcia*, 25 F.4th at 445, 450).  Plaintiffs point out that despite the Government's earlier promise to "address why" "*Barrios Garcia* is distinguishable," (ECF No. 11 at 18–19), the Defendants have failed to distinguish or even address the case.  Plaintiffs argue that the Defendants have not identified any statute that would confer discretion to USCIS "to halt adjudication of an entire nationality's applications," contending that the authorities Defendants invoke instead provide narrower

---

[18] Defendants were represented by the United States Attorney's Office, and this Court refers to the Government interchangeably with Defendants Edlow and Mullin.

[19] This Court commends the Assistant United States Attorney for his candor to the tribunal and forthright analysis of the case law on this issue at both the preliminary injunction hearing and the telephonic status conference, consistent with his duties as an officer of the Court.

discretion to the agency regarding the adjudication of individual applications submitted by each "particular" foreign national. (ECF No. 22 at 3–5).

Plaintiffs raised *Barrios Garcia* again at the preliminary injunction hearing and this Court asked defense counsel for the Government's position on the weight of authority and recent developments in the case law. Defendants thus had another opportunity to distinguish *Barrios Garcia* and engage with the substance of a myriad of other district courts finding they have jurisdiction over similar challenges to USCIS policies and ruling against the Government's position. But defense counsel did not engage with the merits of those decisions; instead, defense counsel focused on the practical impact of Judge McConnell's *Dorcas* decision and the possible remedies this Court could order.

Nevertheless, this Court must still assure itself of its jurisdiction. *See Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009) ("[F]ederal courts have a duty to consider their subject matter jurisdiction in regard to every case."). A review of the relevant statutes—the APA and INA—delineates this Court's jurisdiction.

### A. Judicial Review under the Administrative Procedure Act

The Administrative Procedure Act generally contemplates judicial review of agency actions. To understand why, begin with the judiciary's jurisdictional north star. Federal courts have "judicial Power" to adjudicate cases and controversies. U.S. Const. art. 3, sec. 2, cl. 1.[20]

---

[20] "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;— to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;— between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States; and between a State, or the Citizens thereof, and foreign States, Citizens, or Subjects."

Thus, under the Constitution and the separation of powers into three branches of government, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803). Indeed, the Framers of the Constitution "envisioned that the final 'interpretation of the laws' would be 'the proper and peculiar province of the courts' . . . To ensure the 'steady, upright and impartial administration of the laws,' the Framers structured the Constitution to allow judges to exercise that judgment independent of influence from the political branches." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting The Federalist No. 78 at 522, 525 (J. Cooke ed. 1961) (A. Hamilton)).

The rise of federal agencies tasked with applying laws and promulgating regulations in the modern administrative state led to interpretive entanglements between the judiciary and federal agencies. In some instances, Congress might grant an executive branch agency discretion, and make that discretion unreviewable by federal courts. *E.g.*, *Mullin*, 2026 WL 1825840, at \*10 (INA provision makes executive branch's Temporary Protected Status designation unreviewable)

But absent a clear bar on judicial review, the judiciary remains tasked with the interpretation of the law. And Congress, through the Administrative Procedure Act, codified forms of judicial review for agency actions. *See Loper Bright*, 603 U.S. at 387–90.

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. And federal courts "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. By this provision, Congress "codified . . . the traditional understanding" that courts "must" determine what the law is. *Loper Bright*, 603 U.S. at 390. The APA provides several mandates to reviewing courts that are relevant here. A

reviewing court must (1) "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). A reviewing court must also "hold unlawful and set aside agency action, findings, and conclusions found to be" either: (2) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law"; (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or (4) "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), and (D). In this way, the APA provides "a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950).

In sum, there can be no question "that [t]he interpretation of the meaning of statutes, as applied to justiciable controversies,' [is] 'exclusively a judicial function.'" *Loper Bright*, 603 U.S. at 387 (quoting *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 544 (1940)). Congress provided for judicial review of agency functions in the APA, and this review accords with the traditional understanding of the judiciary's role in our nation's government. "'[I]n cases where [a court's] own judgment . . . differ[ed] from that of other high functionaries,' the court [is] 'not at liberty to surrender, or to waive [its judgment].'" *Loper Bright*, 603 U.S. at 386–87 (quoting *United States v. Dickson*, 40 U.S. 141, 162 (1841)). Under the APA, there is a "presumption favoring judicial review of administrative action" of statutes that are "reasonably susceptible to divergent interpretation," and it "takes clear and convincing evidence to dislodge the presumption." *Kucana v. Holder*, 558 U.S. 233, 251–52 (2010) (citations and internal quotation marks omitted). That said, the APA's presumption favoring judicial review may be rebutted in certain instances. *See Barrios Garcia*, 24 F.4th at 442. For instance, it may be rebutted if the relevant statute precludes review, or if the action is committed to agency discretion by law. 5 U.S.C. § 701(a)(1), (a)(2).

20

Several other principles inform the jurisdictional analysis. First, as a matter of statutory interpretation, the separation of powers cautions courts "against reading legislation, absent clear statement, to place in executive hands authority to remove cases from the Judiciary's domain." *Kucana*, 558 U.S. at 237.

Second, in evaluating Plaintiffs' challenge, it is important to distinguish the "direct review of individual denials" from "general collateral challenges" of agency "practices and policies" used in processing applications. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991). *McNary* carefully distinguishes these types of challenges in the context of immigration proceedings, where the statute barred judicial review of determinations regarding individual applications. The Supreme Court held that a foreign national could bring a due process challenge to Immigration and Naturalization Service[21] amnesty determination procedures despite an INA provision expressly limiting judicial review of individual amnesty determinations. It noted that if foreign nationals could "not . . . pursue their claims in the District Court," they "would not as a practical matter be able to obtain meaningful judicial review . . . of their objections to INS procedures." *Id.* at 496. The Supreme Court further reasoned that Congress was presumably aware of the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action," and therefore it was "most unlikely that Congress intended to foreclose all forms of meaningful judicial review." *Id.*; *see also Mullin*, 2026 WL 1825840, at *8 (explaining that *McNary* "turned on the specific wording of the provision at issue," which barred only "determination[s] respecting an application").

---

[21] Immigration and Naturalization Service was the federal agency in charge of immigration process, enforcement, and border patrol from 1933 until 2003, when USCIS "assumed responsibility for the immigration service functions of the federal government." U.S. Citizenship and Immigration Services, *Our History*, https://www.uscis.gov/about-us/our-history (last visited June 12, 2026).

A few years after *McNary*, the Supreme Court rejected arguments that a particular jurisdiction-stripping provision of the INA, which governed a foreign national's appeal of a denial of "adjustment of status," would "preclude district court jurisdiction over an action challenging the legality of a regulation without referring to or relying on the denial of any individual application." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993).

In conclusion, the scope afforded to judicial review under the APA, our nation's separation of powers between Congress, the executive, and the judiciary, and the difference between a challenge to an individual's adjudication *decision* and a collateral challenge to agency policy inform this Court's analysis of each of the two INA provisions relevant to jurisdiction.

### B. Jurisdiction under the Immigration and Nationality Act

Defendants argue that two neighboring subsections of the INA strip this Court of jurisdiction over Plaintiffs' claims.  The text of these subsections reads, in relevant part:

> Notwithstanding any other provision of law (statutory or nonstatutory) . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review—
> (i)     any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
> (ii)     any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . .

8 U.S.C. § 1252(a)(2)(B)(i)–(ii).  These subsections limit the jurisdiction of federal court review. But that jurisdictional bar is itself narrowly-tailored to certain circumstances not applicable here. To understand why, this Court evaluates each subsection in turn.

### 1. 8 U.S.C. § 1252(a)(2)(B)(i)

First, 8 U.S.C. § 1252(a)(2)(B)(i) strips jurisdiction to review discretionary relief decisions under a few statutory sections, including section 1255, which addresses applications by foreign nationals for permanent residence.  Section 1255 provides that the status of a foreign national "may

22

be adjusted" to that of a permanent resident at the Government's "discretion."  8 U.S.C. § 1255(a). Because this section is about discrete decisions regarding an individual's discretionary relief, it is inapplicable to this Court's jurisdiction in this case, which is about a collateral challenge to USCIS's blanket adjudicatory hold.

The Supreme Court considered this subsection in the context of an individual challenge to removal proceedings.  Evaluating the text of the provision, it concluded that through this provision, "Congress has sharply circumscribed judicial review of the discretionary-relief process."  *Patel v. Garland*, 596 U.S. 328, 332–33 (2022) (citing 8 U.S.C. § 1252(a)(2)(B)).  The Supreme Court then determined that section 1252(a)(2)(B)(i) "prohibits review of *any* judgment *regarding* the granting of relief under § 1255 and the other enumerated provisions," including judgments "*relating to* the granting of relief," which would include "factual findings."  *Id.* at 338–39 (emphasis in original).  Because Congress used broad language, courts are stripped of jurisdiction to review any judgment, including nondiscretionary judgments and judgments intermediate to the final judgment.  *Id.* at 341–43.  *Patel* thus held that "judicial review of fact determinations is precluded in the discretionary-relief context" under the "text and context" of section 1252(a)(2)(B)(i).  *Id.* at 347.

To be sure, *Patel* reads subsection (B)(i)'s jurisdiction-stripping provision broadly, but it does so in the context of an individual's challenge to a judgment regarding discretionary relief under section 1255.  Section 1255 presupposes that an adjustment of a foreign national's immigrant status would occur by the agency's adjustment of the "status of *an alien*," i.e., an *individual* foreign national.  8 U.S.C. § 1255(a) (emphasis added).  At first blush, it is hard to see how policies affecting wide swaths of foreign *nationals* plural would qualify as judgments regarding or relating to grants of relief under section 1255, which addresses relief in the individual-adjudication context.

23

And Defendants conceded that "USCIS's Policy Memoranda *neither conclude[] the agency's decision-making process nor determine[] any rights and obligations or legal consequences*. Rather, the memoranda merely advise[] the public as to adjudication guidance being provided to USCIS personnel." (ECF No. 21 at 14) (emphasis added). Because Defendants effectively take the position that the challenged policies are *not* judgments, but are mere guidance to personnel, the policies appear reviewable and outside subsection (B)(i)'s bar on judicial review.

In context, this conclusion makes sense. The statutory subsection immediately preceding 8 U.S.C. § 1252(a)(2)(B) stripped from federal court jurisdiction review of "procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1)[22] of this title." 8 U.S.C. § 1252(a)(2)(A)(iv). But neither subsection of 8 U.S.C. § 1252(a)(2)(B) has analogous language indicating that, under this subsection, federal courts lack jurisdiction to hear challenges to procedures and policies adopted by DHS or USCIS implementing how they grant discretionary relief to individuals.

In instances "where Congress includes particular language in one section of a statute but omits it in another section of the same Act," courts "generally presume[] that Congress act[ed] intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (2009) (citation omitted); *see, e.g.*, *Mullin v. Al Otro Lado*, 609 U.S. __, 2026 WL 1825741, at *7 (June 25, 2026) (considering variation in language across INA provisions and concluding that a provision's lack of language found elsewhere "signal[s] that Congress enacted the disparate language 'intentionally and purposefully'") (quoting *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)); *Patel*, 596 U.S. at 357 (Gorsuch, J., dissenting) (reviewing the "larger statutory

---

[22] Section 1225(b)(1) addresses the inspection of foreign nationals "arriving in the United States." 8 U.S.C. § 1225(b)(1)(A)(i).

context" of the subsections to 8 U.S.C. § 1252(a)(2)(B)); *Al Otro Lado*, 2026 WL 1825741, at *17–18 (Sotomayor, J., dissenting) (same, with other provisions of the INA); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 167–69 (2012) ("Context is a primary determinant of meaning."); A. Barrett, *Substantive Canons and Faithful Agency*, 90 B. U. L. Rev. 109, 117 & 117 n.28 (2010) (noting that the purpose of linguistic canons, including the canon that "words must be construed in the context of the whole statute," is to aid courts in "decipher[ing] the legislature's intent").

Here, "[b]ecause Congress explicitly stripped jurisdiction to review [USCIS] policies and procedures in § 1252(a)(2)(A)(iv) but not in § 1252(a)(2)(B)(i)," this Court joins the Ninth Circuit and other courts who "presume that Congress did not intend for the latter provision to preclude review of agency policies and procedures." *Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 1005–06 (9th Cir. 2024); *Dorcas*, 2026 WL 1622708, at *12–13.

In conclusion, the "plain meaning" of the text of subsection (B)(i) shows that this provision strips jurisdiction such that "judicial review of fact determinations is precluded in the discretionary-relief context," *Patel*, 596 U.S. at 347; *Hatchet v. Andrade*, 106 F.4th 574, 579 (6th Cir. 2024) ("[F]ederal courts are without jurisdiction to review both discretionary and nondiscretionary judgments related to the granting of relief."), including review of an individual foreign national's application for permanent residence under section 1255. The relatively modest language stripping judicial review from judgments regarding discretionary and nondiscretionary relief on a particular foreign national's application under subsection (B)(i) cannot be distorted to strip federal court jurisdiction from broader legal challenges to agency policies under the APA. Nothing in the statute contemplates a wholesale removal from federal court jurisdiction of what the APA otherwise contemplates—judicial review of USCIS's adoption of broad policies or

25

procedures that have nothing to do with individualized, fact-specific judgments on a foreign national's application.

### 2. 8 U.S.C. § 1252(a)(2)(B)(ii)

Next, 8 U.S.C. § 1252(a)(2)(B)(ii) strips jurisdiction from courts to review "any other decision or action of the Attorney General or the Secretary of Homeland Security," where the authority for the decision is "specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security."

As the Supreme Court has explained, this subsection is "a catchall provision" that must be "[r]ead harmoniously" with the previous subsection. *Kucana v. Holder*, 558 U.S. 233, 246–47 (2010). Like subsection (B)(i), it "bar[s] court review of discretionary decisions." *Id.* at 247. This Court must interpret subsection (B)(ii) in light of subsection (B)(i) and its limitations. Again, the statute addresses specific discretionary decisions regarding an individual foreign national's relief, and does not remove challenges to agency policy from this Court's jurisdiction. *Cf. Bahaduri v. Noem*, 2026 WL 878687, at *5 (W.D. Mich. Mar. 31, 2026) (the discretion relevant to subsection (B)(ii) "is not discretion regarding *when* to adjudicate"). Like subsection (B)(i), subsection (B)(ii) "focuses . . . on individualized forms of discretionary relief . . . not the type of generally applicable rulemaking governing . . . *procedures*." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 630 (D.C. Cir. 2020). Indeed, nothing in the text of subsection (B)(ii) suggests that a catchall provision should be read to do more than similarly apply to individual judgments regarding the granting of relief. If Congress had wished for subsection (B)(ii) to read that way, it need only implement the "procedures and policies" language it included in the preceding subsection of the statute. *See* Section III(B)(1), *supra* (addressing 8 U.S.C. § 1252(a)(2)(A)(iv)).

26

Plaintiffs challenge the legality of the policies. Defendants argue that judicial review here is foreclosed by a variety of statutes and regulations that confer the requisite agency discretion. They suggest that the Secretary of DHS and the Director of USCIS are conferred general discretion under 6 U.S.C. §§ 202(5) and 271(a)(3)(D). They also argue that 8 U.S.C. § 1255(a) grants discretion to "adjust lawful permanent residence [] status," just as 8 U.S.C. § 1324a(h)(3) and 8 C.F.R. § 274a.12(c)(9) provide that employment authorization is "an exercise of the Secretary's discretion." (ECF No. 21 at 5, 8).

Defendants' arguments fail. In the Sixth Circuit, where a statute "supplies only partly discretionary power to DHS [or another agency], the statute is ambiguous enough to sustain the APA's presumption of judicial review." *Barrios Garcia*, 25 F.4th at 445. Here, none of the statutes cited by Defendants shows that USCIS's implementation of these policies is something that has been made wholly "discretionary by legislation." *Kucana*, 558 U.S. at 247.

First, Defendants' statutory authorities for general discretion fail. These statutes mandate that Edlow is responsible for establishing "national immigration services policies and priorities," 6 U.S.C. § 271(a)(3)(D), while Mullin is responsible for establishing "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). Although broad, neither statute unambiguously confers total agency discretion. They simply make USCIS legally responsible for creating immigration policy. *See Barrios Garcia*, 25 F.4th at 445. Nor does either statute unambiguously carve out policymaking from judicial review that is otherwise generally expected under the APA.

Second, Defendants' reliance on 8 U.S.C. §§ 1255(a) and 1324a(h)(3) is similarly unavailing. Section 1255(a) provides discretion for the Attorney General to adjust the status of *an*

27

individual foreign national to that of permanent resident, if certain conditions are met.[23] Nowhere does it confer complete discretion for USCIS or DHS to enact blanket adjudicatory holds for *all* foreign nationals from certain countries. Section 1324a(h)(3), meanwhile, merely provides a definition of the term "unauthorized alien" when discussing employment.[24] Although section 1324a(h)(3) notes that authorization may be under that chapter of the code or by the Attorney General, this miscellaneous provision does not discuss or grant discretion to USCIS or DHS. It merely defines a term. Again, neither statute grants unambiguous discretion.

Defendants have not offered sufficient statutory authority[25] under the INA for the sweeping agency discretion that they claim allows them to make policy insulated from judicial review.[26] As

---

[23] "The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence" if certain conditions are met. 8 U.S.C. § 1255(a).

[24] "As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General." 8 U.S.C. § 1324a(h)(3).

[25] Defendants' appeal to regulatory authority does not help them. Decisions specified as discretionary by regulation are not unreviewable. *See Barrios Garcia*, 25 F.4th at 443. And Defendants cite no regulatory provision that would provide for such agency discretion anyway. Rather, their regulatory authority provides that decisions on *individual* applications are left to agency discretion.

[26] Defendants also rely on several cases to suggest that the challenged adjudication policy is properly subject to 8 U.S.C. § 1252(a)(2)(B)(ii)'s discretion. (*See* ECF No. 21 at 7). But these cases are distinguishable. First, *Kale v. Alfonso-Royals* concerns USCIS's visa retrogression policy, whereby USCIS will hold certain visa applications in abeyance when demand exceeds supply, leaving certain visa applications pending for years without a final determination. *Kale v. Alfonso-Royals*, 139 F.4th 329, 332–33 (4th Cir. 2025). Significantly, visa retrogression is "not merely a case of agency inaction"—rather, USCIS has created "a system such that when a visa is not immediately available to an applicant due to retrogression [due to adjustment in the visa processing priority date], it would place the application in an adjudication hold" rather than deny cut-off visa applications and require refiling. *Id.* at 335.
And although *Bhaidas v. Noem* does not involve the visa retrogression policy, it also has no discussion of the challenged policies at issue in this case. Thus, its jurisdictional analysis is somewhat beside the point—and the *Bhaidas* court denied a motion to dismiss with respect to an APA claim. *Bhaidas v. Noem*, 2025 WL 2996362, at *9 (N.D. Ind. Oct. 22, 2025).

28

relevant here, section 1252(a)(2)(B) insulates from judicial review USCIS decisions adjudicating individual applications.  But to read the statutes provided by Defendants as conferring broad *policy-making* discretion to USCIS, one would have to believe that Congress tucked away an elephant of agency policy-making discretion into a statutory mousehole, particularly in light of Congress's explicit bar of judicial review of policies and procedures under section 1252(a)(2)(A)(iv). *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) (Congress "does not, one might say, hide elephants in mouseholes.").  So 8 U.S.C. § 1252(a)(2)(B)(ii) does not apply.  *See Barrios Garcia*, 25 F.4th at 445.  The catchall provision does not strip this Court of jurisdiction to review Plaintiffs' legal challenges under the APA either.

### 3.  *The INA does not strip this Court of jurisdiction.*

In sum, neither subsection of 8 U.S.C. § 1252(a)(2)(B) strips this Court of jurisdiction over Plaintiffs' claims.  Both subsections govern judicial review of discretionary relief decisions for individual foreign nationals, not reviews of sweeping agency changes to policies and procedures. *Cf. Patel*, 596 U.S. at 344 ("Subparagraph (B) bars review *of only one facet* of the removal process (consideration of discretionary relief).") (emphasis added).  Thus, the statute would prohibit a foreign national from "bring[ing] a factual challenge to orders denying discretionary relief." *Nasrallah v. Barr*, 590 U.S. 573, 586 (2020).  But it does not prevent a foreign national from challenging agency policies and procedures writ large, and federal courts remain obligated with the "responsibility of reviewing agency decisions" under the APA.  *See Patel*, 596 U.S. at 352 (Gorsuch, J., dissenting); *see generally Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 699 (4th Cir. 2019) ("[A]n agency's expression of a broad or general enforcement policy based on the agency's legal interpretation is subject to review.").

29

Nothing in the Supreme Court's recent decision in *Mullin v. Doe*[27] changes this conclusion. *Mullin* concerned challenges to terminations of Temporary Protected Status under a different statutory provision of the INA, 8 U.S.C. § 1254a(b)(5)(A).  There, the question was whether foreign nationals from Syria and Haiti challenging TPS terminations were "entitled to orders postponing the terminations during litigation."  *Mullin*, 2026 WL 1825840, at *2.  The Supreme Court concluded that judicial review was simply barred for the foreign nationals' non-constitutional claims after evaluating section 1254a(b)(5)(A) of the INA, which specifies that there is "'no judicial review of any determination . . . with respect to the termination' of a TPS designation."  *Id.* (quoting 8 U.S.C. § 1254a(b)(5)(A)).  The Court found that "the key term 'determination,'" alongside the phrase "with respect to," were broadening by their nature and use, encompassed "the chain of events leading up to a decision," and thus the TPS judicial-review bar overcame the general presumption favoring judicial review.  *Id.* at *7–8.

The Supreme Court's conclusion in *Mullin* rested on the particular text of the TPS statute, which differs in language and structure from 8 U.S.C. § 1252(a)(2)(B).  The majority still endorsed the interpretative rule that "'when a statutory provision is reasonably susceptible to divergent interpretation, [courts] adopt the reading that accords with' the traditional and basic principle that 'executive determinations generally are subject to judicial review.'"  *Id.* at *8 (quoting *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020)).  And the majority reiterated the importance of context in evaluating a statutory provision.  *Id.* at *10.

The Supreme Court also determined that the "sole" constitutional claim for equal protection would "likely fail," because while some foreign nationals challenging TPS terminations

---

[27] The Supreme Court issued this opinion after the parties had briefed their arguments and this Court had held its preliminary injunction hearing.

had alleged racial animus, others "offer[ed] a strong, race-neutral explanation for Haiti's termination" by claiming that the Trump administration "simply opposes the TPS program." *Id.* at *3. That part of *Mullin* has no bearing on this case. There are no analogous constitutional claims raised here, and the Supreme Court's reasoning is applied to the constitutional claim raised against an administrative scheme of TPS terminations. In sum, the Supreme Court's recent decision in *Mullin* does not alter the outcome here. *Cf. Camarena v. Mullin*, 2026 WL 1864155, at *2–5 (D.D.C. June 29, 2026) (considering "whether [section] 1252(a)(2)(B)(ii) bars [judicial] review" of other INA provisions and determining that it does not).

The APA requires this Court determine whether USCIS "has acted within its statutory authority" in adopting the challenged policies. *Loper Bright*, 603 U.S. at 412. And even where the INA "delegates discretionary authority" to USCIS, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limitations. The Court fulfills that role by recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority,' and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* at 395 (quoting H. P. Monaghan, *Marbury and the Administrative State*, 83 Colum. L. Rev. 1, 27 (1983); other internal quotation marks omitted). Other courts to consider this issue have determined that they have jurisdiction to hear challenges to these immigration policies. *E.g.*, *Varniab*, 2026 WL 485490, at *11; *Bowser*, 2026 WL 555624, at *6; *Behdin*, 2026 WL 1031079, at *11; *Karimi*, 2026 WL 1103448, at *3–6; *Saghafi*, 2026 WL 1127468 at *7; *Doe*, 2026 WL 1170971, at *10; *Meschi*, 2026 WL 1157151, at *1; *Pouri*, 2026 WL 1508425, at *2; *Sepehri*, 2026 WL 1678050, at *2; *Bahaduri*, 2026 WL 878687, at *9; *Dorcas*, 2026 WL 1622708, at * 10–22. This Court joins that chorus. But before

31

turning to the merits of the preliminary injunction issue, a final point on justiciability merits discussion.

## C. Justiciability

Separate from their jurisdictional arguments, Defendants assert that the Government must be afforded latitude to make decisions regarding matters of national security and public safety. They argue that managing the nation's immigration system "is committed to the political branches and is unsuited to judicial second guessing." (ECF No. 21 at 16–17).  Although Defendants raise this point in challenging whether Plaintiffs are likely to succeed on the merits of their claims, this point bears on justiciability.

For a case or controversy to be justiciable, the "subject matter for judicial consideration" must be appropriate. *Baker v. Carr*, 369 U.S. 186, 198 (1962).  A nonjusticiable issue necessitates some inquiry beyond jurisdiction to ask "if consideration of the cause is not wholly and immediately foreclosed," or "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Id.* An issue may be nonjusticiable where there exists:  (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; (2) "a lack of judicially discoverable and manageable standards for resolving it"; (3) "the impossibility deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; (5) "an unusual need for unquestioning adherence to a political decision already made"; or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.* at 217.  A court should not dismiss a cause for non-jusiticiability "[u]nless one of these formulations is inextricable" from it. *Id.*

This Court has a responsibility to raise issues of justiciability *sua sponte* if the parties do not examine the issue. *E.g.*, *United States v. Michigan*, 409 F. Supp. 2d 883, 888 (E.D. Mich. 2006); *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 280 (6th Cir. 2009) (en banc) (Sutton, J., concurring).

Here, no justiciability concerns preclude judicial review.  It is difficult to see how any asserted Government interest in public safety or national security—which Defendants advert to in a perfunctory manner—would have any bearing on foreign nationals who are lawfully present in the United States and are following the Government's requirements to apply for immigration benefits.  Indeed, the "distinction between an alien who has effected an entry into the United States and one who has never entered" is one that "runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *accord Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 100 (D.C. Cir. 2026) ("[This] distinction is etched into the INA's comprehensive and carefully calibrated statutory scheme."); *see also Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality.").  Particularly in light of this distinction, Defendants' position is inherently self-contradictory.  It makes no sense for Defendants to suggest or imply that foreign nationals like Plaintiffs (who are following our country's immigration laws) may be national security or public safety threats, and because they may be threats, the Government will indefinitely pause final adjudication on their applications.  If there were actual national security or public safety concerns about wholesale categories of foreign nationals, surely the executive branch would take swift action to reach a final adjudication to determine and resolve any public safety or national

33

security threat presented by an individual foreign national.  As the logic of Defendants' proffered security justification falls apart, so too would any possible justiciability concern crumble.

True, the executive branch's "evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving 'sensitive and weighty interests of national security and foreign affairs.'"  *Hawaii*, 585 U.S. at 708 (citation omitted); *see generally Holder v. Humanitarian L. Project*, 561 U.S. 1, 33 (2010) (The "evaluation of the facts by the Executive, like Congress's assessment, is entitled to deference.").  And "federal courts do not exercise general oversight of the Executive Branch."  *CASA*, 606 U.S. at 861.

But this case only calls for resolution of a dispute "consistent with the authority Congress has given" the federal courts through the APA.  *Id.*  Any national security concerns that the Executive Branch might have cannot relieve the Judicial Branch from its obligation to decide cases and controversies.  National security cannot be "a talisman used to ward off inconvenient claims." *Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017); *see Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017) (per curiam) (rejecting the argument that "the President's decisions about immigration policy, particularly when motivated by national security concerns, are *unreviewable*"). Defendants' argument to the contrary would allow the Executive Branch to trample on the structure of our constitutional democracy and run contrary to the separation of powers, particularly where the Legislative Branch has assigned to the Judicial Branch, via the APA, an obligation to review agency action.  5 U.S.C. § 706; *see Loper Bright*, 603 U.S. at 412.  "The laws and Constitution are designed to survive, and remain in force, in extraordinary times.  Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008).

34

Plaintiffs have not asked this Court to review President Trump's proclamations or his conclusion that restrictions should be placed on the ability of foreign nationals from certain countries to now *enter* the United States.  Rather, Plaintiffs ask this Court to review the legality of several policies implemented by USCIS that pause benefits adjudications for foreign nationals *already lawfully present within* the United States, while also treating those foreign nationals negatively because of their nationality.  That is a question of law, and "as with most questions of law, the policy pros and cons are beside the point." *CASA*, 606 U.S. at 856; *cf. Patel*, 596 U.S. at 346 ("[P]olicy concerns cannot trump the best interpretation of the statutory text."); *but see Mullin*, 2026 WL 1825840, at *5–7 (detailing foreign policy considerations that may naturally follow from TPS designations of other countries).  The interpretation of a statute "is a familiar judicial exercise." *Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).  As Judge McConnell aptly explained in *Dorcas*:

> [T]he question here is not whether the Court thinks it is wise for USCIS to place a hold on all applications for immigration benefits filed by individuals from Travel Ban Countries.  Such an inquiry is best left to the political branches.  The question instead is whether USCIS *has the legal authority* to enact its Challenged Policies in the first place, which is a purely legal question that this Court is well-equipped to address.

*Dorcas Int'l Inst.*, 2026 WL 1622708, at *11 (citations omitted; emphasis added).  This Court agrees.  When presented with legal questions like the ones here, federal courts "*must* exercise their independent judgment" and decide whether USCIS "has acted within its statutory authority, as the APA requires." *Loper Bright*, 603 U.S. at 412 (emphasis added).  This matter is justiciable, and this Court turns to the requested preliminary injunction.

## IV.  PRELIMINARY INJUNCTION

### A.  Standard of Review

Courts may issue preliminary injunctive relief upon notice to the adverse party when the moving party believes it will suffer immediate and irreparable harm.  *See* Fed. R. Civ. P. 65(a).  A preliminary injunction is an "extraordinary remedy," intended to preserve the status quo until trial.  *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  It "should 'only be awarded upon a clear showing that the [movant] is entitled to such relief.'"  *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Winter*, 555 U.S. at 22).  Given their emergency, nature, preliminary injunctions are "customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party is thus not required to prove his case in full at a preliminary-injunction hearing."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Moreover, the "movant does not need to establish a quantum of proof, whether a preponderance or clear and convincing evidence, with respect to each factor to be eligible for preliminary relief."  *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 513 (6th Cir. 2026).

Courts consider four factors "to be balanced" in evaluating whether to issue a preliminary injunction:  (1) "whether the movant has a strong likelihood of success on the merits"; (2) whether the movant would suffer irreparable injury absent the injunction"; (3) whether the injunction would cause substantial harm to others"; and (4) whether the public interest would be served by the issuance of an injunction."  *S. Glazer's Distribs.*, 860 F.3d at 849 (citation and internal quotation marks omitted).  Although these factors are not prerequisites, if there is no chance of success on the merits, an injunction cannot issue.  *See id.*  The two factors addressing harm to others and the

36

public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## B.  Likelihood of Success on the Merits

The first preliminary injunction factor, which analyzes the movant's likelihood of success on the merits, is "typically the most important" factor in the analysis. *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024).  It alone is not dispositive, however, because courts may also grant a preliminary injunction "if the [movant] has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Sony/ATV Pub., LLC v. Marcos*, 651 F. App'x 482, 485 (6th Cir. 2016) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 199 F.3d 393, 402 (6th Cir. 1997)).

Where multiple claims are at issue, the movant need only show a likelihood of success on the merits of one claim. *See Six Clinics Holding Corp.*, 119 F.3d at 402 (finding it "not necessary" to evaluate likelihood of success on the merits for each claim, so long as likelihood of success is demonstrated on a "central issue"); *see also, e.g.*, *Union Home Mortgage Corp. v. Ballew*, 814 F. Supp. 3d 884, 905 (N.D. Ohio 2025) (Movant "need not demonstrate a likelihood of success on the merits of every claim."); *Oruganti v. Noem*, 2025 WL 1144560, at *6 n.5 (S.D. Ohio Apr. 18, 2025) (Marbley, J.) (collecting cases).

Plaintiffs have advanced four causes of action under the Administrative Procedure Act. (¶¶ 186–216).  They argue that:  (1) the challenged policies unlawfully withheld and unreasonably delayed USCIS action in violation of 5 U.S.C. § 706(1); (2) the challenged policies are arbitrary, capricious, and abuses of discretion in violation of 5 U.S.C. § 706(2)(A); (3) the challenged policies were promulgated without proper notice-and-comment procedures in violation of 5 U.S.C.

§§ 553 and 706(2)(D); and (4) the challenged policies exceeded Defendants' statutory authority in violation of 5 U.S.C. § 706(2)(C). In their motion for a preliminary injunction, they argue that they will likely succeed on these four independent APA claims. (ECF No. 9-1 at 8–17). This Court considers each cause of action and finds that Plaintiffs are likely to succeed on the merits of their claims.

### 1. Agency Failure to Act

Under the APA, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Plaintiffs argue that USCIS's blanket adjudicatory hold constitutes agency action unlawfully withheld or unreasonably delayed. (ECF No. 9-1 at 8–9).

### a. Unlawful Withholding

First, the APA requires that federal courts compel agency action that is "unlawfully withheld." 5 U.S.C. § 706(1). Plaintiffs claim that the challenged policies holding all adjudication on pending immigration benefit applications based on nationality and country of birth constitute the unlawful withholding of agency action under the APA and in light of *Barrios Garcia*. Defendants are silent on this point, failing to address this argument, unlawful withholding under the APA, or *Barrios Garcia* at all. (*See* ECF No. 21 at 10–20). Thus, Defendants have forfeited any opposition on this point, because the "failure to raise an argument at the appropriate stage constitutes forfeiture of the argument in later stages of the litigation." *Martin Luther King, Jr. Cnty. v. Turner*, 2026 WL 161014, at *5 (W.D. Wash. Jan. 21, 2026); *accord Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 85–86 (S.D.N.Y. 2021) (defendant forfeited certain arguments he sought to raise in opposition to a preliminary injunction when he had failed to make those arguments in opposition to an earlier temporary restraining order); *see generally Bannister v. Knox*

*Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011–12 (6th Cir. 2022) (failure of a litigant to present an argument to the district court generally results in forfeiture of that argument). Nevertheless, Plaintiffs still must carry their burden to obtain the extraordinary remedy of a preliminary injunction.

As the Sixth Circuit explained in *Barrios Garcia*, USCIS has created "a non-discretionary duty by binding itself through [its] regulation[s] carrying the force of law." *Barrios Garcia*, 25 F.4th at 450 (quoting *Elec. Priv. Info. Ctr. v. Internal Revenue Serv.*, 910 F.3d 1232, 1244 (D.C. Cir. 2018)). USCIS's governing regulations provide that it *must* adjudicate pending immigration benefit applications. For example, USCIS must render a decision on applications for permanent residence status. 8 C.F.R. § 245.2(a)(5)(i) ("The applicant *shall* be notified of the decision of the director and, if the application is denied, the reasons for the denial.") (emphasis added). It also must adjudicate applications for employment authorization. 8 C.F.R. §§ 274a.13(b)–(c) ("If the application is granted, the alien *shall* be notified . . . If the application is denied, the applicant *shall* be notified . . .") (emphasis added); *see Behdin*, 2026 WL 1031079, at *12 ("Defendant's discretion as to whether to grant or deny particular [Form] I-765 applications does not give Defendant unfettered discretion to indefinitely and categorically delay or withhold adjudication of such applications."). But USCIS is not merely bound by its own regulations. By law, the APA commands that each federal agency "shall proceed to conclude a matter presented to it" with "due regard for the convenience and necessity of the parties or their representatives and within a reasonable time." 5 U.S.C. § 555(b).

In light of the APA's statutory command that USCIS must "proceed to conclude" each benefit application submitted to it, as well as USCIS's own regulations that require decisionmaking for a variety of applications, this Court finds that Plaintiffs are likely to succeed on the merits of

their unlawful withholding claim under the APA. Because Plaintiffs need only show a likelihood of success on the merits for one claim to satisfy this requirement for a preliminary injunction, this factor weighs in favor of the issuance of a preliminary injunction against USCIS's adjudicatory hold.

### b. Unreasonable Delay

The APA also requires that federal courts compel agency action "unreasonably delayed." 5 U.S.C. § 706(1). Plaintiffs argue in the alternative that USCIS has failed to act by unreasonably delaying agency action under the APA. (ECF No. 9-1 at 8–12). They point to the six *TRAC* factors that courts use to evaluate whether an agency's non-adjudication is unreasonably delayed. *Telecomm. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (hereinafter *TRAC*). Defendants counter that Plaintiffs necessarily fail to state a claim for unreasonable delay, because most of their applications (except for John Doe 19's pending Form I-485) have only been pending for a few years. Defendants argue that this amount of time cannot constitute an unreasonable delay. They also argue that the adjudicatory hold is lawful under USCIS's discretionary authority when evaluating each individual application. (ECF No. 21 at 10–13).

Defendants' arguments are unconvincing because as Defendants recognize, (*see id.* at 13), Plaintiffs take issue with the adjudicatory hold arising from the challenged policies. They do not seek any particular relief in the individual adjudication of their pending applications. (*See* ECF No. 9-1 at 19) ("The relief Plaintiffs seek is narrow and individualized—adjudication of their own pending applications and petitions, without application of the Challenged Policies. Plaintiffs do not ask the Court to direct any particular outcome for their applications."). Moreover, Defendants fail to engage with the six *TRAC* factors that aid in determining whether non-adjudication is unreasonably delayed.

40

To determine whether an agency action is unreasonably delayed, federal courts consider the six guiding *TRAC* factors:  (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) any congressional "timetable" informing the rule of reason; (3) delays that intolerably impact "human health and welfare"; (4) the effect expediting delayed action may have on a "higher or competing priority"; (5) the "nature and extent of the interests prejudiced by delay"; and (6) any "impropriety" lurking behind agency inaction—though the reviewing court need not find any such impropriety to determine that agency action is unreasonably delayed.  *TRAC*, 750 F.2d at 80; *Barrios Garcia*, 25. F4th at 451 (applying *TRAC*).  Taken together, these factors weigh in Plaintiffs' favor.

*First*, the "rule of reason" factor suggests unreasonable delay.  Plaintiffs allege that their pending applications are subject to an indefinite adjudicatory hold created by the challenged policies.  (¶¶ 1–2, 51–52).  This indefinite adjudicative hold undermines the prior logic of USCIS adjudications where USCIS had adjudicated immigration benefit applications in a first-in, first-out order of operation.  *See Behdin*, 2026 WL 1031079 at *14.  That USCIS's prior process has been removed for some foreign nationals, subjecting all Plaintiffs to the same undifferentiated hold, undermines a claim to a rule of reason.  *See Barrios Garcia*, 25 F.4th at 452–53 (finding that plaintiffs adequately alleged the first factor where USCIS system would prioritize later-filed applications over plaintiffs' applications).  This factor favors Plaintiffs.

*Second*, timetables informing the rule of reason also suggest unreasonable delay.  True, there is no firm congressional timetable here, although Congress has indicated an expectation that immigration benefit applications should be processed "not later than 180 days after the initial filing of the application."  8 U.S.C. § 1571(b).  So this factor could otherwise be neutral.  *Barrios Garcia*, 25 F.4th at 453–54 ("[W]hen no statute sets a deadline for an agency action, the second *TRAC*

factor is not relevant to an 'unreasonably delayed' analysis."). However, Plaintiffs challenge a wholesale adjudicatory hold on their applications, created by challenged policies that fundamentally conflict with Congress's expected timeline. Moreover, John Does 5, 10, 11, and 17 paid a premium processing fee for their applications, (¶¶ 113, 122, 191; ECF Nos. 9-6 ¶ 5; 9-10 ¶ 7; 9-11 ¶ 3; 9-16 ¶ 5), and yet USCIS has now paused adjudication on their applications but will not issue a refund, contrary to their own premium processing "guarantee."[28] This contradicts Congress's expectation for the collection of premium processing fees, where premium processing may be suspended "only if circumstances prevent the completion of processing of a significant number of such requests within the required period." 8 U.S.C. § 1356(u)(5)(A). Thus, this factor also weighs slightly in favor of Plaintiffs. *Behdin*, 2026 WL 1031079 at *14.

*Third and fifth* (these factors are often considered in tandem), the *TRAC* factors concerning health, welfare, and prejudice strongly suggest unreasonable delay. Plaintiffs exist in a state of limbo, with their reliance on a previous USCIS process fundamentally undercut. Many of them face loss of lawful employment, loss of immigration status, inability to travel and prolonged separation from family abroad. (*See generally* ECF Nos. 9-2–9-19). Others face discrete harms. For instance, John Doe 19 faces potential foreclosure on his home. (ECF No. 9-18 ¶¶ 5–6). John Doe 17 faces a possible return to Iran, where he could be persecuted for converting to Christianity. (ECF No. 9-16 ¶¶ 9–10). These factors weigh heavily in favor of Plaintiffs. *Barrios Garcia*, 25 F.4th at 452.

---

[28] According to USCIS's website, "If you request premium processing, we guarantee that we will take adjudicative action on the case within the time periods described below, or we will refund the premium proceeding fee: 15 business days for most classifications; 30 business days for Form I-765[.]" U.S. Citizenship and Immigration Services, *How do I Request Premium Processing?* (Mar. 23, 2026), available at https://www.uscis.gov/forms/all-forms/how-do-i-request-premium-processing (last visited June 30, 2026).

*Fourth*, the apparent lack of a competing or higher priority suggests unreasonable delay. Defendants have not identified any such priority. There is no indication that USCIS has any particular national security concern regarding any individual Plaintiff. For instance, Jane Doe 9's Form I-765 application was already *approved*, and she simply awaits the final ministerial task of issuing her work authorization document. (ECF No. 9-9 ¶ 6). Defendants have taken Plaintiffs "out of line" when they issued the policies that paused adjudication of their pending applications. *Behdin*, 2026 WL 1031079 at *15. Because there is no indication from Defendants that these Plaintiffs constitute public safety or national security threats, Plaintiffs are likely to show that the adjudication of their individual applications is not a particularly "complex" task that needs to play second fiddle to other agency priorities. *Barrios Garcia*, 25 F.4th at 454–55. This factor weighs in favor of Plaintiffs.

*Sixth*, there is manifest evidence of impropriety imbuing USCIS's decision, which strongly suggests unreasonable delay. Plaintiffs argue that "USCIS's rationale has shifted from national security to a labor-market 'protect American jobs' theory not grounded in any of the Policies themselves." (ECF No. 9-1 at 11–12). In support, Plaintiffs cite a March 31, 2026 statement by USCIS spokesman Matthew J. Tragesser. In that statement, Tragesser announced that optional practical training applications for Iranian nationals would be banned "in accordance with Presidential Proclamation 10998." (ECF No. 1-5). He stated that the Trump administration was "reviewing every immigration benefit to *protect American jobs* by ensuring foreign nationals do not displace American STEM graduates," explaining that Iran was also a high-risk country. *Id.* (emphasis added).

Generally, impropriety need not be found for a showing of unreasonable delay. *See TRAC*, 750 F.2d at 80. But here, the evidence of the impropriety lurking behind USCIS's inaction is on

43

display for all to see.  Indeed, the public record is replete with direct evidence of the administration's hostility toward immigrants, with the possible exception of Scandinavians and white Afrikaners.  Consider the extraordinary contents, tone, and nature of public statements made by the Executive Branch regarding immigration during President Trump's second term in office. These statements indicate an outright hostility to foreign nationals and immigrants from certain countries—predominantly countries in Africa, the Middle East, and the Caribbean—that the administration deems to be undesirable or, in the words of President Trump, "shithole countries." *See* Section II(A), *supra*; *see also Nat'l TPS Alliance v. Noem*,  773 F. Supp. 3d 807, 855, 858–64 (N.D. Cal. 2025) (observing that "President Trump also made a number of discriminatory statements . . . about non-white immigrants . . . generally"); *Miot v. Trump*, 818 F. Supp. 3d 126, 177–80 (D.D.C. 2026) (collecting derogatory statements made by President Trump), *rev'd and remanded by Mullin*, 2026 WL 1825840, at \*13; *cf. In re Grand Jury Subpoenas*, 2026 WL 1783899, at \*1 (observing that "President Trump has repeatedly insulted . . . [Minnesota's] Somali population in particular").

This Court is not and cannot be blind to the "backdrop against which the Challenged Policies were implemented." *Dorcas*, 2026 WL 1622708, at \*52.  President Trump, Vice President Vance, former Secretary Noem, and the Executive Branch as a whole have issued statement after statement that "fairly shout, in their racial undertones and overtones alike," *Mullin*, 2026 WL 1825840, at \*20 (Kagan, J., dissenting), the Government's hostility toward many immigrants from particular countries.  As one district court recently concluded, the "outright disdain for individuals from Travel Ban Countries" reflected by the public statements of President Trump and then-Secretary Kristi Noem "seem[ed] to suggest that, in enacting the Challenged Policies, USCIS personnel seemed less concerned with matters of 'national security' and more so focused on

44

targeting groups of people that their leaders told them they 'DON'T WANT' in the United States, 'NOT ONE.'" *Dorcas*, 2026 WL 1622708, at \*52 (quoting Secretary Kristi Noem (@Sec_Noem), Truth Social (Dec. 1, 2025 at 6:52 PM)).

Or, as the Supreme Court observed in *Mullin*, President Trump has made statements that "broadly denigrate countries" or "malign" certain groups of immigrants, such as "Haitians who have come to the United States." *Mullin*, 2026 WL 1825840, at \*11. That puts it mildly. As the *Mullin* dissent explains, "the evidence [of racial animus] is there, plain to see, in the President's statements, which the majority [and the Government's lawyers] cannot even bear to repeat." *Id.* at \*17 (Kagan, J., dissenting). These statements include President Trump's "repellent and racially inflected" statements about certain "shithole" countries, whose nationals are "poisoning the blood" of the United States. *Id.* at \*20; *accord id.* at \*12 (majority opinion) (voicing disapproval of statements "denigrating the character of Haitians"). Meanwhile, then-Secretary Noem made statements that "expressed antipathy toward travelers from countries covered by a renewed travel ban," or made "derogatory comments about immigration and its effects." *Id.* at \*11 (majority opinion). While *Mullin* ultimately concluded those statements were unlikely to show that race was a motivating factor in the termination of TPS given the Trump administration's apparently uniform desire to end TPS, and thus found that Haitian foreign nationals under TPS would not be entitled to interim relief on an equal protection claim, these statements have a different valence in this case, where the issue is one of possible impropriety in agency inaction.

It is impossible to "ignore the backdrop of extraordinary statements by direct decision-makers when assessing whether the agency's proffered rationale was genuine or merely a pretext" for an ulterior motive. *Nat'l TPS Alliance v. Noem*, 166 F.4th 739, 775 (9th Cir. 2026) (Mendoza, J., concurring). Federal courts need "not . . . exhibit a naiveté from which ordinary citizens are

45

free." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).  These statements are extraordinary and suggest impropriety underlying USCIS inaction.  Perhaps in a different time, such statements could be disentangled from executive branch action "neutral on its face." *Hawaii*, 585 U.S. at 701–02.  But a slew of Executive Branch actions since January 2025 have called into question whether the Executive Branch has "forfeited the right to . . . a presumption of regularity," under which courts presume, absent clear evidence to the contrary, that Executive Branch officers are properly carrying out their official duties. *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 88–92 (D.D.C. 2025) (collecting cases); *United States v. Oregon*, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to [the Government] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."); *Singh v. Tsoukaris*, Case No. 1:26-cv-1531, ECF No. 10 at 2 (D.N.J. Feb. 20, 2026) ("[T]he presumption of regularity and integrity previously and routinely afforded to the Executive branch . . . has been undeniably eroded in this jurisdiction and across the country."); *see also Abrego Garcia v. Noem*, 2025 WL 1135112, at *2 (4th Cir. Apr. 17, 2025) ("The respect that courts must accord the Executive must be reciprocated by the Executive's respect for the courts. Too often today this has not been the case, as calls for impeachment of judges for decisions the Executive disfavors and exhortations to disregard court orders sadly illustrate.").

This sixth factor favors Plaintiffs—though Plaintiffs would prevail on their preliminary injunction even on just the first five *TRAC* factors.

### c.  Conclusion

In sum, Plaintiffs are likely to succeed on the merits of their alternative argument that Defendants, through the challenged policies, have unreasonably delayed adjudication on Plaintiffs' pending immigration benefit applications in violation of the APA.

46

## 2.  *Arbitrary and Capricious Agency Action*

The APA also requires that courts "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Plaintiffs do not only challenge the lack of agency action on their pending applications.  They also challenge USCIS's policies as being arbitrary and capricious final agency action in violation of the APA.  (ECF No. 9-1 at 12–14).  Defendants counter that the policies do not constitute final agency action, because they "merely advise[] the public as to adjudication guidance being provided to USCIS personnel."  (ECF No. 21 at 14).

An arbitrary and capricious agency action "is itself unlawful."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).  Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider," "entirely failed to consider an important aspect of the problem," explained its decision in a way that "runs counter to the evidence before the agency," or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicles Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Although the scope of review of agency action under the APA's arbitrary and capricious standard "is narrow and a court is not to substitute its judgment for that of the agency, the agency nevertheless must examine the relevant data and articulate a satisfactory explanation for its action."  *Id.* at 30; *see SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("The orderly function of the process of review requires that the grounds upon which the administrative agency acted are clearly disclosed and adequately sustained.").  Indeed, "deferential judicial review under the APA does not relieve the agency of its obligation to develop an evidentiary basis for its findings.  To the

47

contrary, the APA reinforces this obligation." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 476 (6th Cir. 2004).

The agency's explanation for its decisions must have "adequate reasons," *Encino Motorcars*, 579 U.S. at 221, "including a rational connection between the facts found and the choice made," *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43. Where the agency's explanation is "clear enough that its 'path may reasonably be discerned,'" it has satisfied this requirement. *Encino Motorcars*, 579 U.S. at 221 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). But if the agency has "failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.*

An agency's action may also change the agency's existing policies. But changes to existing policies also require "a reasoned explanation for the change." *Id.* That does not necessarily mean that the agency must provide a *more* detailed explanation than it would if it were creating a new policy, but it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). When an agency changes policies, it must recognize that "longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 221–22 (quoting *FCC*, 556 U.S. at 515). In these instances, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC*, 556 U.S. at 515–16.

### a. Judicial review extends to the challenged policies.

Defendants focus their attention on whether the challenged policies are final, and thus may be subject to judicial review. Judicial review of agency action extends to agency actions that are "made reviewable by statute," as well as "final agency action for which there is no other adequate

48

remedy in a court." 5 U.S.C. § 704. Generally, "two conditions must be satisfied for agency action to be 'final'": (1) "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

Defendants argue that Plaintiffs have failed to challenge a final agency action, because the challenged policies "neither conclude[] [USCIS's] decision-making process nor determine[] any rights and obligations or legal consequences." Rather, Defendants take the position that the challenged policies "merely advise[] the public as to the adjudication guidance being provided to USCIS personnel," and assert that USCIS "'weighed' any potential resultant 'delay to the adjudication of some pending applications' against the 'urgent need for the agency to ensure that applications are vetted and screened to the maximum degree possible.'" (ECF No. 21 at 14–15). They also argue that the issuance of additional operational guidance and the creation of a USCIS vetting center show that the challenged policies are not final agency action. (*Id.* at 15–16).

For their part, Plaintiffs argue that the challenged policies are indeed reviewable, final agency actions. They point to a multitude of district courts that have reached this conclusion. (ECF No. 9-1 at 12).

On this preliminary record, this Court finds that the challenged policies constitute judicially-reviewable final agency action. Under the first *Bennett* prong, the policies appear to *consummate* USCIS's decisionmaking process following President Trump' proclamations, contrary to Defendants arguments that the policies merely advise the public regarding guidance provided to USCIS personnel. Policy Alert PA-2025-26 notes that USCIS would "consider relevant country-specific facts and circumstances . . . as part of its adjudication of discretionary

49

benefit requests, treating "country-specific factors" as "significant negative factors." (ECF No. 1-1 at 1–2). And Policy Memorandum PM-602-0194 and Policy Memorandum PM-602-0192 place an *indefinite* hold on the final adjudication of all pending immigration benefit applications for foreign nationals from a variety of countries, including many of the countries that Plaintiffs come from. (*See* ECF Nos. 1-2; 1-3). "[S]ignificant pauses and blanket moratoria are final agency actions that cannot be exempted from judicial review merely by being characterized as intermediate." *Massachusetts v. Trump*, 790 F. Supp. 3d 8, 26 (D. Mass. 2025) (collecting cases); *accord Varniab*, 2026 WL 485490, at *16–17.

Under the second *Bennett* prong, the adjudicatory holds may well determine Plaintiffs' rights, but there can be no question that legal consequences will flow from the policies to Plaintiffs. Courts "regularly determine[] that the second prong of *Bennett* is satisfied 'when an indefinite pause is imposed by an agency.'" *Dorcas Int'l Inst.*, 2026 WL 1622708, at *25–26 (quoting *New York v. Trump*, 811 F. Supp. 3d 215, 234 (D. Mass. 2025)). The significant negative factor treatment also may have legal consequences for Plaintiffs, whose applications may be impacted by its application.

Defendants also argue that these policies are not final agency action because USCIS has "implemented a series of robust actions after issuing those policy memoranda" and has established the USCIS Vetting Center in Atlanta "to centralize enhanced vetting using advanced technologies including artificial intelligence." (ECF No. 21 at 15–16). These arguments appear irrelevant—Defendants do not explain how a new vetting center or the use of AI bear on the finality of the policies at issue as they are applied to Plaintiffs.

Other courts have concluded that these policies constitute final agency action susceptible to judicial review. *E.g.*, *Behdin*, 2026 WL 1031079, at *18–20 (finding plaintiffs likely to succeed

50

on arbitrary and capricious APA claim); *Varniab*, 2026 WL 485490, at \*16–17 (same); *Bowser*, 2026 WL 555624, at \*4–6 ("Just because the policy is subject to change does not mean it is interim. . . . and the practical, legal consequences for the Plaintiffs are clear."). This Court agrees, and concludes for the purposes of a preliminary injunction that Plaintiffs have shown sufficiently that the challenged policies are final agency actions, reviewable under the APA.

> *b. Plaintiffs are likely to succeed on the merits in showing that the challenged policies are arbitrary and capricious.*

The inquiry turns to the merits of these policies. Plaintiffs argue that the policies are arbitrary and capricious for five independent reasons. First, they argue that USCIS failed to articulate a rational connection between its objectives and its policies. Second, they argue that USCIS failed to consider their reliance interests. Third, they argue that USCIS abandoned its first-in, first-out adjudicatory methodology without recognizing or justifying that change. Fourth, they argue that USCIS failed to consider whether a hold of fixed duration would accomplish its objectives. Fifth, they argue that USCIS's public statements confirm that its rationale has shifted. (ECF No. 9-1 at 12–14). Plaintiffs' arguments focus on the Policy Memoranda, though they also challenge the Policy Alert and the significant negative factor treatment.

Defendants' merits argument is perfunctory and conclusory. They simply assert that USCIS weighed possible delay to adjudication of pending immigration benefit applications, and apparently determined that the need for USCIS to vet and screen applicants "to the maximum degree possible" outweighed any issues stemming from delay. (ECF No. 21 at 14–15).

Defendants' conclusory assertion is insufficient. *See Saghafi*, 2026 WL 1127468, at \*9 (finding conclusory statements that USCIS "considered" consequences and "weighed" competing interests insufficient to show a rational connection); *Varniab*, 2026 WL 485490, at \*19. *First*,

Plaintiffs are likely to show that there is no rational connection between USCIS's factual findings and its choice of policies. *Dep't of Com.*, 588 U.S. at 773; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. True, the Government has a legitimate interest in safeguarding the nation's security, including from foreign nationals. But the logic of screening foreign nationals who are outside of the country—the basis for the presidential proclamations—makes no sense when applied in an undifferentiated manner to the Plaintiffs, who "are already in the country." *Bowser*, 2026 WL 555624, at *8; *accord Zadvydas*, 533 U.S. at 693; *Leng May Ma*, 357 U.S. at 187. President Trump's power to issue a proclamation "to temporarily suspend the entry of specified foreign individuals into the United States does not contain implicit authority" for USCIS to disregard the requirements of the APA when promulgating agency policies that consummate its decisionmaking process and have resulting legal consequences. *Refugee & Immigr. Ctr.*, 174 F.4th at 104. Plaintiffs are likely to succeed on the merits of this argument.

*Second* assertions of national security interests clash with the reliance interests of foreign nationals like Plaintiffs, who are lawfully present in the United States. Defendants do not address how USCIS accounted for this important reliance interest in formulating policies that would impact foreign nationals like many of the Plaintiffs, "who have been in this country for years." *Karimi*, 2026 WL 1103448, at *10. And it is hard to see how any national security interest "can . . . be served by making beggars out of legal immigrants who are likely to remain lawfully present in the United States indefinitely." *Id.* Defendants' position seems to be that because some foreign nationals already admitted into the United States *may be threats to national security or public safety*, USCIS will *delay* adjudication of their pending benefit applications. *See id.* If that is Defendants' position, it is frankly preposterous. Should the Government's national security concern be legitimate, it is unclear why adjudications that might address that threat ought to be

delayed.  Defendants likewise fail to explain how undifferentiated treatment of Plaintiffs' nationality as a significant negative factor addresses national security concerns.

The problems with the challenged policies are magnified in light of the compelling reliance interests that Plaintiffs assert.  *See Encino Motorcars*, 579 U.S. at 221–22.  Many Plaintiffs have explained, through declarations, how they have generally relied on USCIS's adjudicatory regime prior to the challenged policies to plan their lives.  (*E.g.*, ECF Nos. 9-2 ¶¶ 3–4, 6–10; 9-3 ¶¶ 3, 6–13, 9-4 ¶¶ 4–8; 9-6 ¶¶ 3–9; 9-7 ¶¶ 4–8; 9-8 ¶¶ 3–14; 9-15 ¶¶ 3–8; 9-17 ¶¶ 3–9; 9-19 ¶¶ 2–9).  Several have paid additional fees for premium processing but have not received the speedy processing that USCIS promises.  (*E.g.*, ECF Nos. 9-6 ¶ 5; 9-10 ¶ 7; 9-11 ¶ 3; 9-16 ¶ 5).  John Doe 17, a professor teaching physics and astronomy in the United States, is an Iranian convert to Christianity and could face persecution if returned to Iran.  (ECF No. 9-16 ¶¶ 3–10).  John Doe 19's Form I-485 has been pending for seven years.  (ECF No. 9-18 ¶¶ 3–7).

For other Plaintiffs, it is unclear why they would be subject to the challenged policies at all.  Jane Doe 13 is a Canadian citizen who "is not a national of any country listed" in the presidential proclamations yet apparently is subjected to the challenged policies because she was born in Zimbabwe.  (ECF No. 9-13 ¶¶ 2–10).  And Jane Doe 9's Form I-765 was already *approved* by USCIS, but USCIS has since withheld issuance of the physical employment authorization document.  (ECF No. 9-9 ¶¶ 3–10).  Plaintiffs are likely to succeed on the merits of this argument, too.

*Third*, Plaintiffs are likely to show that Defendants have not recognized their change in policy and shown a good reason for that change in deviating from a first-in, first-out adjudication of pending benefits.  *See Encino Motorcars*, 579 U.S. at 221; *Behdin*, 2026 WL 1031079, at *14 (Defendant Edlow representing that USCIS generally adjudicated Form I-765 applications under

a first-in, first-out procedure); *cf.* Section IV(B)(1), *supra* (the change in USCIS's application triage system undermines a claim to a rule of reason).

Similarly, Plaintiffs' *fourth* argument challenges the logic of an indefinite hold without consideration of whether a hold of a specific, fixed duration could have sufficed to accomplish the same goals. Defendants have not shown or explained why "[a] hold with a fixed end point" could not have "given USCIS time to review and bolster its security review processes while giving applicants some indication of how long they would need to wait." *Meschi*, 2026 WL 1157151, at *1. Plaintiffs are likely to show that USCIS failed to provide a "reasoned explanation" for the indefinite hold. *Encino Motorcars*, 579 U.S. at 221; *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48 ("At the very least this alternative way of achieving the objectives . . . should have been addressed.").

*Fifth* and finally, Plaintiffs argue that USCIS's "shifting or post hoc rationales," as offered by USCIS spokesman Tragesser's statements regarding labor market protectionism, is itself a hallmark of arbitrary agency action. (ECF No. 9-1 at 14). That may well be the case, but Plaintiffs have not shown *why* those post-hoc statements informed the earlier policies, or how they independently demonstrate that the policies are arbitrary and capricious. Certainly, if Defendants had tried to bolster the challenged policies by offering this labor market rationale, that defense could be an "impermissible *post hoc* rationalization." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020). But post hoc rationalizations made through public statements given by a spokesperson do not necessarily show that the earlier agency action was in and of itself arbitrary and capricious. Plaintiffs' overall argument on this point is perfunctory, and they have not shown that they are likely to succeed on the merits of this fifth, separate arbitrary and capricious

54

theory.  That is no great loss to Plaintiffs, however, who have shown that they are likely to succeed on the merits and show that USCIS's policies were arbitrary and capricious for four other reasons.

### 3.  *Notice and Comment*

The APA also requires that courts set aside agency action that is performed "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  Plaintiffs next argue that the challenged policies were promulgated without notice-and-comment procedures, in violation of 5 U.S.C. §§ 553 and 706(2)(D).  Defendants fail to address the substance of this particular argument, resting on their characterization of the challenged policies as mere advice to the public.  (*See* ECF No. 21 at 14).  But, as discussed, this Court has determined that the challenged policies constitute judicially-reviewable final agency action for the purposes of Plaintiffs' preliminary injunction motion.  Thus, Defendants have forfeited opposition on the merits of Plaintiffs' notice-and-comment claim.

Under the APA, when an agency seeks to "promulgate a rule that intends to create new law, rights or duties . . . they must engage in a process known as notice-and-comment rulemaking." *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 710 (6th Cir. 2022). Under this process, the agency must first publish a "notice of proposed rule making" in the Federal Register.  5 U.S.C. § 553(b).  Then, the agency must provide "interested persons [with] an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. § 553(c).  Finally, the agency must "consider[] . . . the relevant matter presented." *Id.*  Only then may the agency adopt the rule. *See Oakbrook*, 28 F.4th at 710.

Plaintiffs are likely to show that the challenged policies are substantive rules subject to notice and comment.  The challenged policies are, by their own terms, mandatory adjustments to how USCIS adjudicates pending immigration benefit applications.  (ECF No. 1-1 at 1) ("Effective

55

immediately, USCIS *will* consider country-specific facts and circumstances such as those outlined in [Proclamation] 10949 as part of its adjudication of discretionary benefit requests.") (emphasis added); (ECF No. 1-3 at 1) (directing USCIS personnel to "hold . . . all pending benefit applications for aliens listed in [Proclamation] 10998 . . ."). They do not appear to be mere "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" to which the notice and comment requirements of the APA do not apply. 5 U.S.C. § 553(b)(A). The "critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96–97 (2015) (quoting *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995)). Although easier to issue than substantive rules, interpretive rules lack "the force and effect of law and are not accorded that weight in the adjudicatory process." *Id.* at 97.

Given that the challenged policies impose obligations on USCIS personnel, Plaintiffs are likely to show that they are substantive in nature. Other courts have reached similar conclusions in evaluating motions for preliminary injunctions. *E.g.*, *Behdin*, 2026 WL 1031079, at *22–23. This Court concludes that Plaintiffs have shown that they are likely to succeed on the merits of this notice-and-comment claim.

### 4. *Ultra Vires*

Finally, the APA prohibits agency action taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Plaintiffs' last argument is that the challenged policies exceed Defendants' statutory authority and thus are *ultra vires* actions taken in excess of legal authority. (ECF No. 9-1 at 16–17). They first contend that the policy alert exceeds USCIS authority and discriminates based on nationality, in violation of

56

the INA. They also argue that policy memoranda violate USCIS's obligation to adjudicate properly-filed benefit applications.

Defendants counter that 8 U.S.C. § 1182(f) confers authority to President Trump to suspend entry into the United States. (ECF No. 21 at 2). They posit that Mullin (as the Secretary of Homeland Security) and Edlow (as the Director of USCIS) receive plenary statutory authority to implement the INA under 8 U.S.C. §§ 1103(a)(1), 1103(a)(3), and 6 U.S.C. § 271. (*Id.* at 17–18).

Defendants are correct that section 1182(f) confers broad authority to the President to "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate" by proclamation, should the President "find[] that the entry of aliens or any class of aliens into the United States would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). But *entry* of foreign nationals into the United States is distinct from the conferral of benefits to foreign nationals *already present within* the United States. Nothing in the text of section 1182(f) suggests that it should be read to apply in these circumstances; indeed, the provision goes on to discuss the Attorney General's ability to "suspend the entry of some or all aliens transported to the United States" by "a commercial airline [that] has failed to comply with regulations . . . relating to requirements of airlines for the detection of fraudulent documents used by passengers traveling to the United States." *Id.* So, while section 1182(f) confers authority to the Government to suspend the entry of foreign nationals into the United States, that authority is limited to the circumstances of actual entry.

Moreover, Defendants' reliance on section 1182(f) is inapposite for the simple reason that the applicable Presidential Proclamations here do not actually require or even anticipate the adjudicative hold policy. The Presidential Proclamations also do not discuss USCIS's

57

implementation of national origin as a significant negative factor in adjudicating immigration benefit applications.  Instead, they "involve restrictions on 'the entry' of noncitizens 'into the United States' from other countries, not the consideration of benefit applications from noncitizens already within the United States."  *Doe*, 2026 WL 1170971, at *15.  Thus, section 1182(f) appears simply inapplicable to this case as a source for USCIS's authority.  *See Varniab*, 2026 WL 485490, at *19.

Defendants' reliance on sections 1103(a)(1) and 1103(a)(3) presents more of a mixed picture of statutory authority.  First, section 1103(a)(1) simply "charge[s]" Secretary Mullin "with the administration and enforcement of . . . all . . . laws relating to the immigration and naturalization of aliens.  8 U.S.C. § 1103(a)(1).  This is a duty, not a wellspring of authority.  By contrast, section 1103(a)(3) seems to be a comparatively better source of authority because it allows the Secretary to "establish regulations . . . and perform such other acts as he deems necessary for carrying out his authority."  8 U.S.C. § 1103(a)(3).  While the challenged policies are not regulations, they may constitute those "other acts" deemed necessary by Secretary Mullin.  Recall that Edlow is directed by statute to "establish national immigration services policies and priorities," 6 U.S.C. § 271(a)(3)(D), while Mullin is charged with "[e]stablishing national immigration enforcement policies and priorities."  6 U.S.C. § 202(5).  Though this Court already concluded that neither statute *unambiguously* grants Defendants total discretion to pause agency adjudications mandated by law, *see* Section III(B)(2), *infra*, whether or not Plaintiffs are likely to show that USCIS lacked authority to issue the challenged policies is a slightly different inquiry.  So, Defendants have pointed to statutory authority allowing USCIS to issue policies in general.  The question becomes whether the policies created pursuant to that authority exceed USCIS's authority under the INA and its regulatory regime.

The policies USCIS creates pursuant to that statutory grant of authority cannot violate the INA's mandate that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's . . . nationality." 8 U.S.C. § 1152(a)(1)(A). But discriminating against nationalities is precisely what Policy Alert PA-2025-26 does. This discrimination extends to immigration benefit applications for permanent residence and work authorization, *Doe*, 2026 WL 1170971, at \*16, which most Plaintiffs have submitted. (*See* ECF No. 9-1 at 16–17). And to the extent that section 1103(a)(3) requires a necessity finding, Policy Alert PA-2025-26 does not address any necessity finding at all. (*See* ECF No. 1-1). Thus, Plaintiffs are likely to succeed on the merits of their argument that the challenged policy alert was issued absent authority.

Similarly, Plaintiffs are likely to succeed on the merits of their argument that Policy Memorandum PM-602-0192 and Policy Memorandum PM-602-0194 exceed USCIS authority because they violate USCIS's duty to adjudicate properly-filed benefit applications. Recall that Congress expects that immigration benefit applications will be processed within a finite time, *see* 8 U.S.C. § 1571(b); *cf.* 5 U.S.C. § 555(b) (APA mandate that federal agencies "proceed to conclude" matters presented), and USCIS has bound itself by regulation to adjudicate many types of pending immigration applications, including applications for permanent residence and employment authorization. 8 C.F.R. §§ 245.2(a)(5)(i), 274a.13(b)–(c); *see* Section IV(B)(1)(a), *supra*. The indefinite adjudicatory hold implemented by the challenged policies contradicts USCIS's duty to adjudicate. And Defendants' application of the challenged policies to Jane Doe 13, a Canadian citizen, contradicts their reliance on the Presidential Proclamations. Plaintiffs are also likely to succeed on the merits of their argument that the challenged policy memoranda were issued absent authority.

### 5. *Conclusion*

Because this Court has determined that Plaintiffs are likely to succeed on the merits on all their APA claims for unlawful withholding and unreasonable delay, for lack of notice-and-comment procedures, and for exceeding authority, as well as for four of their five theories of liability under their arbitrary and capricious APA claim, this factor weighs in favor of entering the requested preliminary injunction.

### C. Immediate, Irreparable Harm

The second preliminary injunction factor evaluates the immediacy and irreparability of the claimed harm that will occur absent injunction. Immediacy requires a showing of "actual and imminent" harm, "rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 551–52 (6th Cir. 2006) (citations and internal quotation marks omitted). Irreparability indicates a type of harm that cannot be fully compensable by money damages, though an injury is not fully compensable by money damages if the "nature" of the loss makes damages "difficult to calculate." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (citations and internal quotation marks omitted).

Plaintiffs argue that without a preliminary injunction, they will suffer irreparable harm through a variety of injuries, including the loss of the legal ability to work, rescission of job offers, and an inability to travel, with a concomitant prolonged separation from family abroad. (ECF Nos. 9-1 at 17–18; 22 at 7–8; *see* ECF Nos. 9-2–9-19). Certain Plaintiffs face particular harms—for instance, John Doe 19 faces "imminent risk of losing [his] employment," with the resultant threat of foreclosure and bankruptcy. (ECF No. 9-18 ¶¶ 5–6). John Doe 1, a licensed pharmacist, feels as though he cannot "move forward" with his life, career, home, and community in Columbus, Ohio. He fears that despite being granted asylum in the United States, he may be forced back to

60

Syria and face persecution.  (ECF No. 9-2 ¶¶ 6–7, 9).  Jane Doe 13, a registered nurse and Canadian citizen, attests that she is under "constant uncertainty" causing "significant mental strain," made worse by "[t]he fear of being detained by [Immigration and Customs Enforcement]."  (ECF No. 9-13 ¶ 9).  John Doe 17, the Iranian Christian convert, fears religious persecution if forced to return to Iran.  (ECF No. 9-16 ¶ 9).  Finally, Jane Doe 9's Form I-765 was already approved, and she only awaits the issuance of her work authorization document.  She may lose her employment if her already-approved work authorization document is not issued soon.  (ECF No. 9-9 ¶¶ 6, 8–10).

Defendants counter that Plaintiffs cannot demonstrate an immediate, irreparable injury that is likely to occur.  (ECF No. 21 at 18–20).  Although "sympathiz[ing] with Plaintiffs' concerns," Defendants contend that Plaintiffs have not established an injury that would be prevented by a preliminary injunction, because even if the policies were made inapplicable to them, their pending benefit applications "are highly unlikely to be immediately granted."  Relying on two out of circuit district court cases, Defendants argue that their national security concerns eclipse Plaintiffs' interest in the adjudication of their pending applications.  They suggest that any alleged harm arising from the inability to plan for the future is not irreparable.  (*Id.* at 19).

Defendants' arguments are unavailing.  Any persuasive weight their out-of-circuit authorities might have is tempered greatly by the fact that they predate the challenged policies at issue in this case.[29]  Plaintiffs have sufficiently shown the risk of immediate, irreparable harm absent a preliminary injunction.  First, this Court has previously determined that jeopardy to a foreign national's immigration status can generate irreparable harm, even if that harm is economic, because money damages likely will not be available when such litigation concludes.  *Oruganti*,

---

[29] In fact, one of Defendants' cited cases actually undermines their case.  There, the district court's dicta regarding national security concerns was tempered by the fact that "USCIS [was] actually processing plaintiff's application."  *Safadi v. Howard*, 466 F. Supp. 2d 696, 701 (E.D. Va. 2006).

2025 WL 1144560, at *3–4 (observing that money damages are unavailable for APA claims). But even if Plaintiffs could recover damages, there is reason to suspect that ascertaining and "calculating damages would be futile," and thus unwinding injuries would be impracticable, *Kalmbach Feeds, Inc. v. Purina Animal Nutrition, LLC*, 2025 WL 3153412, at *12 (S.D. Ohio Nov. 12, 2025) (Marbley, J.), given the unique ways in which legal constraints on work authorization impact the ability of foreign nationals to maintain employment and earn a living. Other courts are in agreement, finding that the loss of legal ability to work constitutes irreparable harm. *E.g.*, *Bowser*, 2026 WL 555624, at *9.

Second, and relatedly, Plaintiffs have presented evidence of other irreparable harms they may suffer if their applications remain frozen. (ECF Nos. 9-2–9-19). "These harms include inability to travel to visit family, inability to make basic life decisions, and significant emotional strain." *Varniab*, 2026 WL 485490, at *23; *cf. Oruganti*, 2025 WL 1144560, at *5 (threats to immigrant status may place a foreign national's "education, research, financial stability, and career trajectories at imminent risk of irreparable harm," not to mention the "risk of detention or deportation"). The career risk appears acute for many Plaintiffs in this case, where individual work authorizations hang in the balance. *See Iowa Migrant Movement for Justice v. Bird*, 157 F.4th 904, 929 (8th Cir. 2025) (the foreign national who "might be prevented from pursuing her chosen career" may face irreparable harm); *see generally Terrace v. Thompson*, 263 U.S. 197, 215 (1923) (Foreign nationals have a "right to earn a livelihood by following the ordinary occupations of life."). Moreover, the instability created by the adjudicative holds may generate similar irreparable harms by subjecting Plaintiffs to the looming specter of deportation. For immigrants, "deportation may result in the loss 'of all that makes life worth living.'" *Bridges v. Wixon*, 326 U.S. 135, 147 (1945) (quoting *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)).

62

Plaintiffs have sufficiently shown at this preliminary stage that so long as they are subjected to the "indefinite limbo" caused by the challenged policies, they are harmed.  (ECF No. 22 at 8). The lack of a final adjudication on the merits of each individual application is not the harm at issue. Rather, Plaintiffs are continually and irreparably harmed while the adjudication of their applications is subject to a blanket hold and their applications receive negative treatment due to their nationality.  This factor favors a preliminary injunction.

### D.  Balance of Harms and Public Interest

The final two preliminary injunction factors are the balance of harms and the public interest.  These factors merge when the Government is a party,[30] *Oruganti*, 2025 WL 1144560, at *7 (citing *Nken*, 556 U.S. at 435), though the Government's role as respondent does not render the public interest "negligible."  *Nken*, 556 U.S. at 434–35 (addressing stay issuances and recognizing the "substantial overlap" with the preliminary injunction factors).

Defendants raise perfunctory arguments about national security concerns.  (ECF No. 21 at 19).  To be sure, there is a strong public interest in national security, and facilitating considerations of safety in evaluating pending immigration benefit applications.  *See Bowser*, 2026 WL 555624, at *7–8.  But any national security justification offered by Defendants for challenged policies makes no sense in this case.  *See* Section IV(B)(2)(b), *supra*.  Plaintiffs "are already in the country."  *Bowser*, 2026 WL 555624, at *8.  Defendants fail to explain how a delay of a decision on pending immigration benefit applications for foreign nationals *already within the United States* could ameliorate any public safety or national security concern.  Their arguments amount to nothing more than a talismanic invocation of national security.  To be sure, under some

---

[30] Although the Government is not a named party in this case, Defendants Edlow and Mullin are sued in their respective official capacity as Government officers.

circumstances, national security concerns may justify holds on certain pending immigration benefit applications.  But there must be "a rational connection between the facts found and the choice made."  *Dep't of Com.*, 588 U.S. at 773 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  Based on this preliminary record, there is no rational connection here between any such concern and the challenged policy decisions, which place sweeping and indiscriminate holds and negative factors on the pending immigration benefit applications of vast swaths of foreign nationals.  The Government has not shown how its national security interests could be harmed by requiring Defendants to adhere to the law—specifically, the requirements of the APA, the INA, and the regulations that govern USCIS.

By contrast, there is an overriding public interest in ensuring that Government agencies adhere to the letter of the law.  *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) (recognizing the "greater public interest in having governmental agencies abide by the federal laws that govern their existence and operations"); *Oruganti*, 2025 WL 1144560, at *7 (the "public interest is served when administrative agencies comply with their obligations under the APA").  Similarly, there is a strong public interest in ensuring that foreign nationals receive fair treatment and due consideration once they have applied for immigration benefits.  *Cf. Nken*, 556 U.S. at 436 (recognizing the public interest, in the context of removal of foreign nationals, that weighs in favor of "preventing aliens from being wrongfully removed").  Plaintiffs have shown that the balance of harms and the public interest favor a preliminary injunction.

### E.  Remedy

All preliminary injunction factors favor Plaintiffs, and this Court must tailor appropriate relief, bearing in mind "the rule that injunctive relief should be no more burdensome to the

defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Plaintiffs request this Court issue an order: (1) enjoining Defendants and their subordinates from applying the challenged policies to any pending immigration benefit application filed by Plaintiffs; (2) directing Defendants to resume processing Form I-485 and Form I-131 applications in the ordinary course, without application of the challenged policies; (3) compelling Defendants to adjudicate each Plaintiff's pending Form I-765 application within thirty days, and, where applicable, issuing employment authorization documents for Plaintiffs whose Form I-765 applications are based on optional practical training with validity periods adjusted to restore time lost due to the unlawful hold; (4) directing Defendants to either adjudicate applications for Plaintiffs who paid the premium-processing fee, or to refund the premium-processing fee; (5) directing Defendants to issue and deliver Jane Doe 9's employment authorization document immediately, given that her Form I-765 was approved on December 3, 2025; and (6) waiving the bond requirement. (ECF No. 9-1 at 20).

Should this Court rule in Plaintiffs' favor, Defendants request that they be ordered to adjudicate the pending applications as if the challenged policies did not exist, arguing that this Court should not place Plaintiffs in a more favorable position than foreign nationals who did not file a lawsuit or were not subject to the challenged policies. In essence, Defendants ask this Court to not permit Plaintiffs to "jump the line" or skip ahead of others who might have had applications pending before them.

### 1. Relief

*First*, this Court finds that a preliminary injunction is warranted. Defendants Joseph B. Edlow and Markwayne Mullin and their officers, agents, and employees at the U.S. Citizenship

65

and Immigration Services and the Department of Homeland Security are hereby enjoined from applying Policy Alert PA-2025-26, Policy Memorandum PM-602-0192, or Policy Memorandum PM-602-0194 to any pending immigration benefit application filed by any of the Plaintiffs in this action.

*Second*, Defendants shall resume processing each Plaintiff's pending Form I-485 and Form I-131 applications in the ordinary course, without application of the challenged policies.[31]

*Third*, Defendants shall adjudicate each Plaintiff's pending Form I-765 within thirty days of this Court's order. For Plaintiffs with Form I-765 applications based on optional practical training, should Defendants grant the pending applications, Defendants shall issue employment authorization documents with validity periods adjusted to restore all time lost due to the adjudicatory hold implemented by the challenged policies.[32]

*Fourth*, Defendants shall, for each Plaintiff who paid a premium-processing fee for an application that is pending, either (a) take adjudicative action within the expedited timeframe from the date of this order, should that expedited timeframe still be live; or (b) refund the paid premium-processing fee(s) to the payor, in accordance with law and regulation. *See* 8 U.S.C. § 1356(u)(5)(A); 8 C.F.R. §§ 106.4(f)(1), (4).

---

[31] The parties agree with this remedy should Plaintiffs' requested relief be granted.

[32] Although Defendants asked this Court to simply restore Plaintiffs' Form I-765 applications to the queue for adjudication in the ordinary course, this Court agrees with Plaintiffs that, as an equitable matter and due to the preliminary stage of the litigation, it is uncertain whether Defendants are maintaining an orderly queue. Moreover, this Court is concerned that simply returning Plaintiffs to the pool of foreign nationals with pending immigration benefit applications could paint them with a proverbial scarlet letter in the eyes of USCIS, leading them to be singled out for further adverse treatment despite this injunction.

*Fifth*, Defendants shall issue Plaintiff Jane Doe 9's employment authorization document within seven days of the date of this Court's order, as her Form I-765 application was approved on December 3, 2025 but the ministerial task was never completed. 8 C.F.R. § 274a.13(b).

## 2. Bond

Finally, this Court considers an appropriate bond. Under Rule 65(c), federal courts "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although Rule 65(c)'s language is mandatory on its face, district courts have discretion to determine whether to require security. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995).

Plaintiffs request that this Court waive the bond requirement, observing that other courts have done so. (ECF No. 9-1 at 20). The amount of required bond ordinarily depends on the gravity of the potential harm to the enjoined party, and this Court has previously found that only a nominal bond is required in an immigration benefit case where the public interest considerations are "strong." *Oruganti*, 2025 WL 1144560, at *7. The record does not reflect any reason why bond in this case should differ from the $1.00 bond ordered in *Oruganti*. Accordingly, each Plaintiff is ordered to post a nominal bond with the Clerk of Court in the amount of $1.00, for a total bond of $25.00.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 9) is **GRANTED**. Defendants U.S. Citizenship and Immigration Services Director Joseph B. Edlow and Department of Homeland Security Director Markwayne Mullin are hereby **PRELIMINARILY ENJOINED** from applying Policy Alert PA-2025-26, Policy Memorandum

PM-602-0192, or Policy Memorandum PM-602-0194 to any pending immigration benefit application filed by any Plaintiff in this action.

Defendants are **ORDERED** to resume processing all pending Form I-485 and Form I-131 applications filed by Plaintiffs in this action in the ordinary course, and to adjudicate all pending Form I-765 applications within thirty days of the date of this order. For any granted Form I-765 applications that are based on optional practical training, Defendants **SHALL** issue employment authorization documents with validity periods adjusted to restore any and all time lost due to the adjudicatory hold implemented by Policy Alert PA-2025-26, Policy Memorandum PM-602-0192, or Policy Memorandum PM-602-0194. Defendants **SHALL** inform each Plaintiff of all final adjudicatory decisions. If Defendants deny any application, they **SHALL** inform this Court of that decision and the reasons for denial.

Defendants are **FURTHER ORDERED** to either (a) take adjudicative action within the expedited timeframe or (b) issue a refund for Plaintiffs who paid premium-processing fees for a pending immigration benefit application.

Defendants are **FURTHER ORDERED** to issue Plaintiff Jane Doe 9's employment authorization document within seven days of the date of this Order.

Plaintiffs' request for a waiver of the bond requirement is **DENIED**. Each individual Plaintiff is **ORDERED** to post a nominal bond of $1.00 with the Clerk of Court.

Within thirty days of this Order, Defendants are **ORDERED** to file with this Court and serve on the Plaintiffs a report in writing under oath setting forth in detail the manner and form in which USCIS and DHS have complied with the terms of this injunction. Defendants are **FURTHER ORDERED** to notify this Court and Plaintiff within three days should further USCIS

68

policies be promulgated that would hold, delay, or treat differently any pending immigration benefit application that has been submitted by any Plaintiff in this action.

Counsel for Defendants **SHALL** provide written notice of this Order to all Defendants **within two days** of this Order, and **SHALL** certify to this Court once notice has been provided.

Counsel for all parties in this matter and this matter's related cases (*Nazari v. Edlow*, Case No. 2:25-cv-1313, and *Charles v. Edlow*, Case No. 2:26-cv-149) are **ORDERED** to meet and confer in good faith to discuss the extent to which this Order might resolve outstanding issues across these cases. Within sixty days of the date of this Order, the parties in the related cases **SHALL** notify this Court of their respective positions regarding outstanding issues.

The Clerk of Court is **DIRECTED** to docket this Order in this matter's related cases.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: July 6, 2026**

69